*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0382p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ARIEL PEREZ, SR., Personal Representative of the
ESTATE OF ARIEL E. PEREZ, JR.,

> *Plaintiff-Appellant,*

        No. 05-1583

*v.*

OAKLAND COUNTY; OAKLAND COUNTY SHERIFF;
MICHAEL J. BOUCHARD, Oakland County Sheriff;
JOHN DOE, Unknown Oakland County Sheriff's
Department Deputies; ROBERTA RICE; MICHAEL
MONROE, TERRY MONTGOMERY, and JOHN
JORGANSON, Deputies; SARATH HEMACHANDRA,
Dr., Jointly and Severally,

> *Defendants-Appellees.*

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-70171—Gerald E. Rosen, District Judge.

Argued: April 20, 2006

Decided and Filed: October 18, 2006

Before: MOORE, GRIFFIN, and CUDAHY, Circuit Judges.[*]

---

### COUNSEL

**ARGUED:** Kenneth J. Wrobel, Jr., Anthony A. Yezbick, Birmingham, Michigan, for Appellant. Steven M. Potter, POTTER, DeAGOSTINO, O'DEA & PATTERSON, Auburn Hills, Michigan, Kerry L. Rhoads-Reith, KOPKA, PINKUS, DOLIN & EADS, Farmington Hills, Michigan, for Appellees. **ON BRIEF:** Kenneth J. Wrobel, Jr., Birmingham, Michigan, for Appellant. Steven M. Potter, Rick J. Patterson, POTTER, DeAGOSTINO, O'DEA & PATTERSON, Auburn Hills, Michigan, Kerry L. Rhoads-Reith, KOPKA, PINKUS, DOLIN & EADS, Farmington Hills, Michigan, for Appellees.

      CUDAHY, J., delivered the opinion of the court. GRIFFIN, J. (pp. 14-17), delivered a separate opinion concurring in the result and in all portions of the majority opinion except Section

---

[*] The Honorable Richard D. Cudahy, Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

II.A.1.  MOORE, J. (pp. 18-19), delivered a separate opinion concurring in part and dissenting in part.

---

### OPINION

---

RICHARD D. CUDAHY, Circuit Judge.  This is a tragic case.  In November 2002, eighteen-year-old Ariel Perez, Jr. (Perez) hung himself from a bedsheet tied to a vent in his single cell in the Oakland County Jail in Pontiac, Michigan, resulting in his death three days later.  Perez's father, plaintiff-appellant Ariel Perez, Sr. (Perez Sr.), the personal representative of Perez's estate, brought a 42 U.S.C. § 1983 action in the district court against the Oakland County, Michigan, caseworker/counselor at the jail Roberta Rice, the Oakland County Sheriff and several of his deputies and jail psychiatrist Sarath Hemachandra, M.D.  Perez Sr. argues that the defendants violated Perez's Eighth Amendment right to be free from cruel and unusual punishment by failing to provide appropriate mental health treatment and suicide monitoring.[1]  The defendants filed for summary judgment, and the district court issued a memorandum opinion and order granting summary judgment on all of the federal claims and declining supplemental jurisdiction on all state-law claims.  Perez Sr. timely appealed.

### I. BACKGROUND

*Perez's Prior Terms of Incarceration at Oakland County Jail*

Perez was born in 1983. He did not complete high school, and was diagnosed as having Attention Deficit Hyperactivity Disorder (ADHD) and as being learning disabled when he was six years old.  Perez began serving sentences in the Oakland County Jail at a fairly young age. In February of 2001, when he was 17 years old, he pleaded guilty to two charges of felony larceny from a building and was given a six-month sentence on May 11, 2001. It was initially determined that due to Perez's age he should serve his time in a boot camp. However, after he reported to a boot camp counselor that he was experiencing hallucinations and hearing voices telling him to quit or escape, Perez was transferred to the Oakland County Jail in late June, 2001. When Perez arrived at the jail, he was met by defendant Roberta Rice, an inmate caseworker. Perez told Rice that he had been hearing voices for the past two years telling him to hurt himself, but he did not listen to the voices. He also stated that he had tried to hang himself at the ages of 14 and 17.

Rice determined that Perez should get a psychiatric evaluation, which was conducted by Dr. Sarath Hemachandra on July 5, 2001. Dr. Hemachandra noted Perez's history of hearing voices and considering suicide, his learning disability, his ADHD diagnosis and the fact that Perez had taken Ritalin as a child. Dr. Hemachandra diagnosed Perez with schizoaffective disorder, a personality disorder and a learning disorder. He prescribed psychiatric medication, individual counseling and substance abuse counseling. He also noted that Perez should be "watched closely."

Perez was housed with a roommate and placed on a 30-minute "active behavior watch" (ABW), based on the assessments of Rice and Hemachandra.  On July 10, 2001, Rice met with Perez

---

[1] Perez did not discuss his claims against the Oakland County Sheriff and several of his deputies in this appeal. Thus, we consider those claims waived. *United States v. Isaiah*, 434 F.3d 513, 522 (6th Cir. 2006). Additionally, we will not discuss the claims concerning Dr. Sarath Hemachandra, since both parties stipulated to a motion to dismiss appellee Dr. Hemachandra from this lawsuit based on a settlement agreement between the two parties.  We granted this motion on June 27, 2006.

because he was refusing to take his Zyprexa medication. Rice decided to discontinue the 30-minute ABW following this meeting.

On August 20, 2001, Perez was in a crisis state, and jail staff determined that he was suicidal. They placed him in an attorney booth until he could be seen by Rice. Rice met with Perez, and he indicated that he was considering hurting himself by cutting his wrist with a razor or hanging himself with a sheet. He said "I feel like I'm going crazy." Rice told Perez that she wanted him moved to the front holding tanks so that he could be closely supervised. He stated that he would commit suicide if he was placed in such a holding tank, but the move was made, and he was placed on an "active suicide watch" (ASW).

Rice met with Perez the next day, August 21, 2001. Perez stated that he felt better and wanted to be moved out of the holding cell. He indicated that he had no suicidal thoughts or intentions and he said he would not cause trouble if moved to the main jail. Rice downgraded Perez's status from ASW to ABW. She thought he seemed stable, and she approved his reassignment to the main jail.

Rice again met with Perez on September 19, 2001, after Perez he been placed in an observation cell as a result of a fight he had had with another inmate. Perez stated that he was not suicidal, that he had been taking his medications and that he had been doing fine prior to the fight. Rice brought up the idea of Perez's being placed in a single cell due to his trouble getting along with other inmates, and Perez agreed to this. Rice also determined that Perez did not appear suicidal and no watch was necessary. Jail officials asked Rice if Perez could be placed in an 11-man cell, but she said this placement was inappropriate in light of Perez's age, mental health treatment and learning disability. Perez continued to be incarcerated without incident until his release on October 9, 2001.

Perez was again incarcerated at the Oakland County Jail for two days in late April, 2002, after an altercation with his father. While Perez was at the jail, Rice responded to a phone call from Perez's sister, Jennifer Perez. Jennifer Perez told Rice that Perez had not been compliant with his mental health treatment, that he had been hearing voices telling him that he was no good and that he should kill himself and that her father wanted Perez to get treatment. Rice gave Jennifer Perez the name of the medications Perez had been given while he was incarcerated and the phone numbers of Collaborative Solutions and Mercy Network. Perez was again incarcerated at the Oakland County Jail in late August 2002, but the reasons for this incarceration are not clear from the record.

Between his April and August incarcerations, Perez received treatment at St. Joseph Mercy Hospital and the North Oakland Medical Center (NOMC) for depression and suicidal thoughts. A petition for hospitalization was prepared on Perez's behalf, a doctor diagnosed him as suffering from schizophrenia and he was given antipsychotic medication. Additionally, he was placed in a psychiatric ward at NOMC from mid-May through early June. In early October 2002, Perez went to the NOMC emergency room and stated that he was hearing voices telling him to hurt his sister and break into a restaurant. Perez was again diagnosed with schizophrenia and another petition for hospitalization was prepared on his behalf**.**

*Incarceration Period During Which Perez Committed Suicide*

On October 24, 2002, Perez returned to the Oakland County Jail after violating his probation. Early in the morning on October 25, 2002, Perez told a guard that he was hearing voices. He asked to speak to a counselor immediately, but said he did not feel suicidal. A half hour to an hour later, Perez attempted suicide by tying his pants around his neck and the bars of his holding cell. A deputy placed Perez on ASW status, and he was placed in an observation cell. Rice came to see him soon after, and she continued the suicide watch. Perez was also seen by Dr. Hemachandra on an emergency basis that day. Perez told Dr. Hemachandra that he had attempted suicide in order to see a counselor and obtain medication (Lithium and Zypreza, which he had been taking prior to his

incarceration) sooner. Dr. Hemachandra prescribed these medications and recommended that Perez be kept under close supervision.

Perez and Rice met on October 28, 2002, and Perez stated that he felt better since receiving the medication and that he did not feel suicidal. He told Rice that he had not wanted to kill himself when he attempted suicide, but instead, he had made the attempt because he wanted to be taken out of the holding cell and given medication. Rice discontinued Perez's ASW status and approved his transfer back to the general prison population, finding that he was cooperative and his thought process appeared to be within the normal limits. He was moved to a 10-man cell on October 30, 2002.

On November 4, 2002, Rice and Perez met again, following a report she received that Perez was refusing to take his medication. Perez told Rice he thought he did not need the medication, that he had lied about his symptoms in the past in order to get the medication, hoping that it would help him cope with his term in jail. He said he had been depressed in the past, but that he had become a Christian and had a purpose in life. He further stated that he did not feel suicidal, and that he wanted a cell assignment that would allow him to work on his General Educational Development Test (GED). Rice noted that Perez "appears manipulative in order to get his way," that he did not appear suicidal and that he "appears stable at this time." She determined no watch was needed.

On November 8, 2002, Perez was evaluated again by Dr. Hemachandra. Dr. Hemachandra's report from this session documented Perez's history of ADHD, cannabis dependence, suicide attempts, paranoia and mood swings. Dr. Hemachandra asked Perez if he had been hearing voices, and Perez said that he had not. He said he never had and that he lied about hearing voices in order to get medication to help his insomnia and depression. Dr. Hemachandra again diagnosed Perez with schizoaffective disorder, cannabis dependence, a learning disorder and a personality disorder. He did not, however, find evidence of suicidal intent. Dr. Hemachandra recommended Perez be given individual counseling and substance abuse counseling. He also prescribed Zyprexa and Lithium for Perez and explained to Perez that it was important for him to take these medications.

On November 18, 2002, Perez met with Rice after Deputy John Jorganson requested Perez be approved for single cell housing because Perez had been stealing from other inmates in his 10-man cell. Perez admitted to Rice during their meeting that he had been stealing from the other inmates. Perez also told Rice that he was not taking his psychiatric medication since he believed he did not need it. Rice asked Perez why he had not discussed this decision with Dr. Hemachandra, and Perez responded by telling Rice that his cellmates encouraged him to continue getting the medication so that he could sell it to them. Perez stated he did not feel suicidal, he had frequent contact with his family and he was not feeling depressed or anxious. Rice found that Perez's "insight appears limited" and "judgment appears poor," but that he did not appear at risk of suicide, was stable and could be housed in a single cell without supervision.

The next day, November 19, 2002, Rice reviewed Perez's case with Dr. Hemachandra because of Perez's refusal to take his medication. Consistent with the standard protocol designed to minimize unused medication in the jail environment, Dr. Hemachandra discontinued Perez's medications, but moved Perez's next scheduled psychiatric appointment up from November 29 to November 26.

On November 22, 2002, in the evening, Deputy Michael Monroe was working in the C-Block area where Perez was housed. He was relieved that evening by Deputy Terry Montgomery. Clock rounds of Perez's cell were performed at 5:47 pm and 7:03 pm, a gap of 76 minutes. Perez was not on any kind of special watch. According to other inmates, Perez placed a sheet over his cell during this period, which blocked the view into the cell. After their 7:03 pm rounds, jail personnel

discovered that Perez had hung himself with a bed sheet that had been tied to the vent of his cell. He died on November 26, 2002 from injuries sustained as a result of this action.

*District Court Action*

On January 14, 2003, Perez Sr. brought an action with respect to these events in the district court. The claim initially involved only Oakland County and its jail personnel, but Dr. Sarath Hemachandra and Roberta Rice were later added as defendants. Perez Sr. argued that the defendants violated Perez's Eighth Amendment right to be free from cruel and unusual punishment. He also filed state law claims with the district court.

Following discovery, all defendants filed motions for summary judgment. After Perez Sr. filed a brief in opposition to these motions, the district court issued a Memorandum Opinion granting summary judgment for the defendants and declining to exercise supplemental jurisdiction over the remaining state law claims. Perez Sr. filed a timely appeal with this court in April 2005.

## II. DISCUSSION

This Court reviews a district court's decision to grant summary judgment *de novo. Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004); *Stemler v. City of Florence*, 126 F.3d 856, 866 (6th Cir. 1997). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is not a genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding the motion, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *See Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990).

*A. Claims Against Roberta Rice*

Perez Sr. argues that the district court was correct when it found that there was a genuine issue of material fact as to whether Rice acted with deliberate indifference in violation of Perez's Eighth Amendment Rights, but the court erred when it found that Rice was nonetheless entitled to qualified immunity, and thus her motion for summary judgment should be granted.

*1. Eighth Amendment Claim*

Section 1983 prohibits any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" from depriving any U.S. citizen "of any rights, privileges, or immunities secured by the constitution and laws." Perez Sr. argues that Perez's Eighth Amendment right under the United States Constitution was violated. The Eighth Amendment prohibits the infliction of cruel and unusual punishment. U.S. Const. amend. VIII.

As applied to prisoners, this constitutional guarantee encompasses a right to medical care for serious medical needs, including psychological needs. *See Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). However, the Eighth Amendment prohibits mistreatment only if it is tantamount to "punishment," and thus courts have imposed liability upon prison officials only where they are "so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004) (citing *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)), *reh'g en banc denied.* Negligence or

medical malpractice alone cannot sustain an Eighth Amendment claim, absent a showing of deliberate indifference. *Estelle*, 429 U.S. at 105-06.

"Deliberate indifference" as analyzed by this court has both an objective and a subjective component. *See Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). In cases involving an inmate's medical needs, the need "must be, objectively, 'sufficiently serious.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294 (1991)). In considering the subjective component, this circuit has emphasized that a plaintiff must produce evidence showing "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703. The subjective component requires that an official who actually knew of the serious medical need possessed "a sufficiently culpable state of mind in denying medical care." *Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834). "Deliberate indifference requires a degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* at 813 (quoting *Farmer*, 511 U.S. at 835). The Supreme Court has also said, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

This court has held that "deliberate indifference may be established by a showing of grossly inadequate care as well as [by] a decision to take an easier but less efficacious course of treatment." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002) (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). However, the 11th Circuit cases upon which *Terrance* was based note that a showing of "grossly inadequate care" satisfies only the objective prong of the "deliberate indifference" standard. Plaintiff must still present evidence of a prison official's subjective awareness of, and disregard for, a prisoner's serious medical needs. *See Campbell v. Sikes*, 169 F.3d 1353, 1364-65 & n.9 (11th Cir. 1999). Additionally, in an en banc decision regarding a prison suicide, this circuit emphasized that the plaintiff had to show that the defendant prison psychiatrists must have known of, and yet disregarded, an excessive risk to inmate health or safety. *See Williams v. Mehra*, 186 F.3d 685, 692 (6th Cir. 1999) (en banc).

Here, Perez Sr. argues that Rice violated Perez's Constitutional rights by failing to provide appropriate mental health treatment or monitoring while he was being held in the Oakland County Jail in the fall of 2002. The district court found, and we ultimately agree, that Perez Sr. showed a genuine issue of material fact as to whether Rice's conduct satisfied both the objective and subjective components of the deliberate indifference standard. We also agree with the district court, however, that this is a very close, and thus difficult, case.

Perez Sr. had to show that Rice was aware of a serious medical need (his mental illness as manifested in suicide risk) and that she acted with deliberate indifference to that need. A genuine issue of fact regarding the objective component of the standard can be met by a showing that Perez posed a strong likelihood of another suicide attempt. *See Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005); *Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992). Perez had threatened and attempted suicide on several occasions in the past and had been placed on behavior and suicide watches during his periods of incarceration at the Oakland County Jail. Perez attempted suicide in his cell in October 2002, only a month or so before his successful suicide in November 2002. This October attempt prompted Rice to place Perez in an observation cell under an active suicide watch and Dr. Hemachandra to recommend that Perez be kept under close observation. Additionally, Dr. Hemachandra testified that past threats or attempts at suicide are considered when determining whether an individual is suicidal, though someone who has previously considered or attempted suicide will not necessarily do so again. Dr. Hemachandra also testified that a patient who fails to take prescribed psychotropic medication posed a risk of becoming depressed, of inability to control

moods and of becoming ultimately suicidal. *Perez v. Oakland County*, 380 F. Supp. 2d 830, 841 (E.D. Mich. 2005). Perez also presented expert testimony stating that individuals who suffer from schizophrenia and have made past suicide attempts are more likely than others to attempt suicide again. *Id.*

Despite this evidence, there are certainly reasons to doubt the objective conclusion that Perez posed a strong likelihood of another suicide attempt. Dr. Hemachandra, a trained and licensed psychiatrist, opined that Perez gave no indication of suicidal intention during his final evaluation on November 8, 2002. Additionally, Rice's counseling notes during the time period of early to mid-November show that Perez denied any suicidal intention, and they reflect Rice's conclusion that Perez was not suicidal or otherwise in need of an enhanced watch status. Ultimately, however, we find that viewing the facts in the light most favorable to the plaintiff, there is a question of fact remaining as to whether there was a recognizable significant likelihood of Perez's attempting suicide.

The district court also correctly found that a genuine issue of fact remains on the subjective component of this inquiry—whether Rice acted with deliberate indifference to a serious medical need of which she was aware. Throughout her time treating Perez, Rice made the decision, on several occasions (most recently a month before he committed suicide), to place Perez on an elevated watch status and to house Perez in an observation cell or with roommate(s). Viewing this evidence in the light most favorable to Perez Sr., this evidence can be construed as demonstrating that Rice had the subjective knowledge, at least at times, that Perez posed a risk of suicide. Thus, there is a question of fact remaining whether Rice knowingly disregarded this risk by moving Perez to single cell housing on November 18, 2002, without first requesting a medical judgment from Dr. Hemachandra whether this placement was appropriate for Perez. Rice's notes of her November 18, 2002 counseling session can also be viewed as focusing unduly on Perez's problems with other inmates, without considering his mental health needs and whether he would be at risk of suicide if placed in a single cell. *Id.* at 842-43.

The district court also correctly found that Rice cannot rely on Dr. Hemachandra's November 8, 2002 assessment of whether Perez was suicidal (he determined that Perez was not on that date) because the situation did not remain stable between that date and the date Rice assigned Perez to a single cell. Rice learned during this time that Perez was refusing to take his medication without Dr. Hemachandra's consent or direction, and also that Perez was experiencing problems getting along with other inmates.

Once again, however, the record is not clear-cut on this issue. As the district court noted, a reasonable juror could construe Rice's November 4 and November 18, 2002 reports stating that Perez did not appear suicidal to mean that Rice did not subjectively perceive the danger posed by Perez's condition and thus could not have acted with deliberate indifference, whether or not she *should* have perceived such a risk, or whether or not she should have trusted her own non-medical judgment about Perez's state, given the changed circumstances since Dr. Hemachandra's most recent evaluation of Perez. However, we ultimately agree with the district court that viewing the evidence in the light most favorable to Perez Sr., as we are compelled to do (*see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)), there is a genuine question of material fact remaining as to whether Rice acted with deliberate indifference to Perez's serious medical needs.

Taken together, the evidence regarding the objective and subjective inquiries for deliberate indifference create a genuine issue of material fact whether Rice demonstrated deliberate indifference by disregarding a risk of known serious harm to Perez by making housing decisions for him without consulting a medical professional. This, however, is a conclusion which we can reach only with some reluctance in view of the uneven quality of the record.

### 2. Qualified Immunity Claim

Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Walsh v. Cuyahoga County*, 424 F.3d 510, 513 (6th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[Q]ualified immunity [] is an immunity from suit, not just from an ultimate assessment of damages." *Archie v. Lanier*, 95 F.3d 438, 440 (6th Cir. 1996) (citing *Mireles v. Waco*, 502 U.S. 9, 11 (1991)). This immunity shields officials "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)), *reh'g & reh'g en banc denied* (Dec. 30, 2005).

"The purpose of the qualified immunity defense is to protect public officials 'from undue interference with their duties and from potentially disabling threats of liability.'" *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003) (quoting *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999)). In *Skousen v. Brighton High Sch.*, this court noted that:

> the philosophy behind the doctrine of qualified immunity is a desire to avoid the substantial costs imposed on government, and society, by subjecting officials to the risks of trial. Such burdens include distraction of officials from their government duties, inhibition of discretionary action, and deterrence of able people from public service.

*Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002) (internal quotation marks omitted).

In evaluating a qualified immunity defense, this court engages in a two-part analysis. We first determine whether, on the facts alleged, the official violated a constitutional or statutory right. *Walsh v. Cuyahoga Cty.*, 424 F.3d 510, 513 (6th Cir. 2005) (citing *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005)). We view the facts alleged in the light most favorable to the party seeking to defeat immunity, in this case Perez Sr.. *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005). If the plaintiff does not establish the violation of a constitutional or statutory right, the inquiry ends there and the official is entitled to immunity. *See Midkiff v. Adams Cty. Reg. Water Dist.*, 409 F.3d 758, 771 (6th Cir. 2005), *reh'g & reh'g en banc denied* (Aug. 30, 2005).

Here, we have already determined that there is a genuine issue of fact as to whether Rice violated Perez's Eighth Amendment constitutional right. Thus, though it is a close case, we cannot hold that Rice is entitled to qualified immunity (on summary judgment) based on the first step of the qualified immunity analysis.

We thus move to the second step of the qualified immunity test; we determine whether the right violated was "clearly established" at the time of the violation. *Myers*, 422 F.3d at 352 (citing *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005)). The burden of showing that the right was clearly established "rests squarely with the plaintiff." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999) (quoting *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997)).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Moreover, the plaintiff must show that the right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. If reasonable officers could disagree about the lawfulness of the conduct in question, immunity must be recognized. *Key*, 179 F.3d at 1000.

In order to determine if the law is clearly established such that a reasonable official could determine that her actions were unlawful, we look principally to the law of this circuit and to the Supreme Court. *Lavado v. Keohane*, 992 F.2d 601, 606 (6th Cir. 1993); *Poe v. Haydon*, 853 F.2d 418, 423-24 (6th Cir. 1988). However, we have held that the lack of Supreme Court or Sixth Circuit precedent "is not a sufficient condition for concluding that the law is unclear on the subject and [thus that] qualified immunity must be granted to a defendant." *McCloud v. Testa*, 97 F.3d 1536, 1556 (6th Cir. 1996). "[T]he decisions of other courts can also clearly establish the law[,] but they must point [unmistakably] to the unconstitutionality of the conduct and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." *Summar v. Bennett*, 157 F.3d 1054, 1058 (6th Cir. 1998) (internal citation omitted).

For a right to be clearly established, "there need not be a case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). *Cf. United States v. Lanier*, 520 U.S. 259, 271 (1997) ("general statements of the law are not inherently incapable of giving fair and clear warning, and in [some] instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful")(internal citation omitted); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) ("an action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs").

For Perez Sr., this precedent taken together means he must show that binding authority would have alerted reasonable people in Rice's position that her conduct was unlawful. In the context of a prisoner's Eighth Amendment medical-care claim, such precedent had to alert Rice that her conduct was deliberately indifferent to a strong likelihood that Perez would try to kill himself.

We ultimately find that Rice is entitled to qualified immunity because no law exists that would clearly establish for a person in Rice's position that she was violating Perez's Eighth Amendment rights. Perez Sr. is correct that Perez's right not to have prison officials treat his known serious medical need with indifference, including psychiatric and psychological counseling and medication, was clearly established by binding case law at the time of his death in November 2002. In April 2002 we stated the applicable general proposition: "It is well settled that the 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment.'" *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. Apr. 8, 2002) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This court has also said more specifically that "a prisoner's 'psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies.'" *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (quoting *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994).

These established principles, however, were not enough, on their own, to alert a reasonable caseworker that Rice's conduct was deliberately indifferent under the circumstances. "[W]e do not assess the right violated at a high level of generality, but instead, we must determine whether the right [is] 'clearly established' in a more particularized . . . sense." *Myers v. Potter*, 422 F.3d 347, 356 (6th Cir. 2005) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)). "Because most legal rights are 'clearly established' at some level of generality, immunity would be impossible to obtain if a plaintiff were required only to cite an abstract legal principle that an official had 'clearly' violated." *Martin v. Heideman*, 106 F.3d 1308, 1312 (6th Cir. 1997).

For example, in *Brosseau v. Haugen*, 543 U.S. 194 (2004), the Supreme Court evaluated the qualified immunity claim of an officer who had shot an individual who had been attempting to flee from law-enforcement officers in motor vehicles. The Supreme Court found the "cases relevant to the 'situation [Brosseau] confronted'" to be ones that considered "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.* at 600 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). *Brosseau* has been interpreted to mean "that the law is not clearly established when it is 'heavily dependent on the specific facts of each case and no case squarely addresse[s] the facts of this case.'" *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005) (citing *Randall v. City of Fairbanks*, 352 F.Supp. 2d 1028, 1037 (D. Alaska 2005)).

In *Comstock v. McCrary*, 273 F.3d 693 (2001), this court held that once a prisoner has been deemed suicidal, it is clearly established that the prisoner is entitled to continuing medical treatment. Here, Perez was not deemed to be suicidal at the time he was moved to the single cell. Additionally, Perez was not generally deprived of medical treatment involving his mental health needs. Thus, Perez Sr. would have to prove that his son's right to have his serious medical needs treated without deliberate indifference encompassed a right to a correct assessment of his suicide risk or an effective suicide-monitoring arrangement. *See Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989) ("The 'right' that is truly at issue here is the right of a detainee to be screened correctly for suicidal tendencies and the right to have steps taken that would have prevented suicide. The general right to medical care, for example, is not sufficient to require a police officer to have known that he had to determine that Danese was seriously contemplating suicide and stop him from following through."). Perez identifies no pre-November 2002 published decision of the U.S. Supreme Court or this court requiring such a determination, nor have we found any.

If no binding precedent is available that directly holds that conduct materially or fundamentally similar to Rice's was unlawful in October-November 2002 under the circumstances, as is the case here, the court may still find that Rice violated a clearly established right through one other avenue:  showing "a generally applicable principle from either binding or persuasive authorities whose 'specific application to the relevant controversy' is 'so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional.'"  *High v. Fuchs*, 74 F. App'x 499, 502 (6th Cir. 2003) (quoting *Summar v. Bennett*, 157 F.3d 1054, 1058 (6th Cir. 1998)).

However, Perez Sr. failed to show such a principle. On the contrary, by October 2002 this circuit's published case law had established that inmates have no general right to be correctly screened for suicidal tendencies. *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989), *cited by Davis v. Fentress County*, 6 F. App'x 243, 249 (6th Cir. 2001) ("Nor has this court recognized a generalized right of a prisoner to be protected against committing suicide."). The circuit's published case law also held that "the generalized right of a prisoner to be free from deliberate indifference [to a known serious medical need] cannot support a finding that there was a clearly established right to be protected from committing suicide." *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1096-97 (6th Cir. 1992).

We acknowledge that Rice may have demonstrated poor judgment in several ways. She made critical decisions based ultimately on her own assessment of Perez's risk of suicide, even though she had suicide-detection and prevention training but no advanced psychiatry or psychology degree; she may have underestimated Perez's risk of suicide; additionally, making a cell-assignment decision or recommendation without first consulting Perez's treating physician or prison psychiatrist Hemachandra may have been ill-advised. These arguable errors might make Rice liable for negligence or negligent infliction of emotional distress, but those are properly the subject of state-law tort claims, not an Eighth Amendment claim. We find no case law to suggest that any of these errors clearly violated Perez's Eighth Amendment rights.

Finally, we must consider Perez Sr.'s claim that Rice is not entitled to qualified immunity because her conduct involved performance of a ministerial, rather than a discretionary, function. It is well established that only officials performing discretionary, as opposed to ministerial, functions, are entitled to qualified immunity. *Davis v. Holly*, 835 F.2d 1175, 1178 (6th Cir. 1987). However, we decline to address the merits of this argument because Perez Sr. waived this issue by not raising it at the district court. We do not consider an argument raised for the first time on appeal unless the party shows that refusal to consider the argument would result in a miscarriage of justice. *United States v. Isaiah*, 434 F.3d 513, 522 (6th Cir. 2004). Perez Sr. does not argue that such a miscarriage of justice would occur here, and we do not believe it would. Perez Sr.'s only reply to Rice's waiver argument is "[t]he issue most certainly is properly before the Court. Rice brought her motion for summary judgment, in part, based on a qualified immunity argument. The District Court held she is entitled to qualified immunity. [Perez Sr.] filed an appeal which challenges that Rice is entitled to qualified immunity." (Pl.'s Reply Br. 22). Perez Sr.'s argument fails because he had a chance to respond to Rice's motion for summary judgment in the district court and did not raise the ministerial function argument. Because this specific argument was made for the first time on appeal and our decision not to address the issue does not result in a miscarriage of justice, we decline to consider the issue. *See Isaiah*, 434 F.3d at 522. For these reasons, we find that the district court was correct in granting summary judgment for Rice based on her entitlement to qualified immunity.

## B.  § 1983 Claim Against Oakland County

Plaintiff brought a federal § 1983 claim against Defendant Oakland Country. A municipality (or in this case a county) "cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents." *Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir. 2000) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). In *Monell*, the Supreme Court held that a municipality can, however, be found liable under § 1983 where a policy of the municipality itself causes the constitutional violation at issue. The Court said, "[i]t is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. This court has likewise said, "[f]or liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort." *Gregory* 220 F.3d at 441. Additionally, Perez Sr. must show that "through its deliberate conduct, the [County] was the 'moving force' behind" the violation of his constitutional rights – that is, he "must show that the [County's] action was taken with the requisite degree of culpability and must demonstrate a direct casual link between the [County's] action and the deprivation of federal rights." *Gregory*, 220 F.3d at 442 (quoting *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405 (1997)).

The "deliberate indifference" standard applies to the County. *See Gray v. City of Detriot*, 399 F.3d 612, 617-18 (6th Cir. 2005); *Barber v. City of Salem*, 953 F.2d 232, 238-40 (6th Cir. 1992). The County has "a duty . . . to recognize, or at least not to ignore, obvious risks of suicide that are foreseeable," and to take reasonable steps to prevent an inmate's suicide "[w]here such a risk is clear." *Gray*, 399 F.3d at 618. However, "[d]eliberate indifference remains distinct from mere negligence. Where a city does create reasonable policies, but negligently administers them, there is no deliberate indifference and therefore no § 1983 liability." *Gray*, 399 F.3d at 618 n.1 (6th Cir. 2005). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. at 410. In evaluating § 1983 claims against counties, we consider legitimate governmental interests such as "the allocation of resources," including "time, personnel, and money." *Roberts v. City of Troy*, 773 F.2d 720, 725 (6th Cir. 1985).

Here, Perez Sr. must identify an Oakland County policy or custom that demonstrated deliberate indifference to the serious mental health needs of inmates at the County Jail. Liability would rest, if at all, on the actions of Rice in the context of the County's policy, since we found that

she violated Perez's Eighth Amendment rights. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001). Perez Sr. argues that the County policy that demonstrates deliberate indifference and that is a violation of the Eighth Amendment is allowing non-medical personnel such as Rice to make the ultimate decision about the housing assignments of mentally ill inmates.

The district court found that Perez Sr. failed to show a genuine issue of fact as to whether the County demonstrated deliberate indifference by allowing case workers like Rice to make housing decisions that sometimes implicated the medical needs of inmates. *Perez v. Oakland County et al.*, 380 F. Supp. 2d 830, 851 (E.D. Mich. 2005). We agree. Perez Sr. provides no evidence that this practice has ever resulted in a suicide or attempted suicide by another inmate, either at the County Jail or in another jail across the country. It does not seem "obvious," as Perez Sr. argues (Pl.'s Br. 59), that allowing a caseworker well-trained in mental health needs and suicide[2] to occasionally make housing decisions that affect the mental health of inmates would result in a suicide, and the lack of statistics to support this conclusion furthers the argument that there was a lack of foreseeability. *See Gray*, 399 F.3d at 619 (finding no deliberate indifference partly because the plaintiff's decedent was the only individual who had committed suicide in a City of Detroit facility in the past 20 years). We agree with the district court that supplying expert testimony that the County's practice is inadequate and poses a risk to inmates does not support the conclusion that the County acted with deliberate indifference to Perez's mental health needs, though it might support the conclusion that the County was negligent. A finding of negligence does not satisfy the deliberate indifference standard. *See Gray*, 399 F.3d at 618-19; *Molton v. City of Cleveland*, 839 F.2d 240, 246 (6th Cir. 1988).

Perez Sr. also argues, in support of its position of deliberate indifference, that the County's policy of allowing a caseworker like Rice, as opposed to a medical professional, to make screening and placement decisions, is unusual. ("Critical decisions as to the care and treatment of these mentally ill inmates are not typically made by non-medical officials."). (Pl.'s Br. 59). This statement is contrary to Perez Sr.'s own expert, Dr. Houston, who testified that such prisoner screening and placement decisions are commonly made by non-medical officials in prisons across the country, although he apparently considered that practice ill-advised:

> Q.      So is it your testimony that the practice across this country in county jails is that most county jails are in conformance or nonconformance with this standard?
>
> A.      As you have phrased it, not in conformance.
>
> Q.      Because the vast majority of county jails out there have individuals who are trained in suicide identification and prevention who are not psychiatrists, correct?
>
> A.      Correct.
>
> Q.      And these people every day make determinations whether or not somebody is suicidal or potentially suicidal, correct?
>
> A.      Correct.

---

[2]Between Rice's hiring by the jail in 1994 and the decedent's suicide in November 2002, Rice took courses in Suicide Assessment and Prevention, Understanding Suicide-Nonverbal and Circumstantial Clues; Handling the Mentally Ill on the Street or in Lockup; Suicide Awareness and Handling Aggressive Behavior; Non-violent Crisis Intervention; Dealing with the Frustrating Client; Psychiatric Emergencies; Understanding Depression; Anger and Aggressiveness; Suicide Assessment and Interventions Strategies; Recognition/De-escalation of Violent Clients; Angry Adolescents; Personality Disorders in Social Work and Health Care; Understanding Anger; Understanding Anxiety; and Assessment/Treatment of Obsessive-Compulsive and Body Dysmorphic Disorders. (J.A. 377).

> Q.      Good. And you would agree that across this country, the vast majority of decisions as to whether or not an individual is suicidal or potentially suicidal are not made by psychiatrists or clinical psychologists in the county jail correctional setting, correct?
>
> A.      Correct.

JA 347-48 & 349.

Perez Sr. also fails to show a genuine question as to whether there was a "direct casual link between the [County's] action and the deprivation of federal rights." *Gregory*, 220 F.3d at 442. In fact, Perez Sr. seems to be arguing, at least in parts of his brief, that if Rice simply followed the County's policy and left Perez in the ten-man cell, it is unlikely that Perez would have committed suicide:

> Pursuant to the policy, Perez should have never been housed in a single cell without any special watch. . . . What Rice did when she placed Perez in a single cell without any special watch and with the tools necessary for Perez to easily harm himself [presumably the bedsheet] was the worst possible thing she could have done. *Arguably, doing nothing and maintaining the status quo* [by keeping Perez in the ten-man cell] *would not have been good, but Perez would probably be alive today.*

(Pl's Br. 28) (emphasis added). Perez Sr. contends that by placing the decedent in a single cell just before his suicide, caseworker Rice "*wholly disregarded jail policy*" (Pl's Br. 27) (emphasis added) requiring that "inmates indicating potentially suicidal behavior shall be housed in a multiple cell with appropriate supervision watch recommended." *Id.* (quoting J.A. 592, Perez Sr. Opp'n to SJ, Ex. 28, Cty. Jail Policy #58 dated Feb. 25, 1987). Further, Perez Sr. argues "Rice was aware of jail policies regarding housing of mentally ill inmates and potentially suicidal inmates, yet she disregarded them. . . . Rice's conduct can basically be summarized as follows: first, *she ignored jail policy* regarding the housing of potentially suicidal inmates . . . . It simply cannot be objectively reasonable to completely disregard a written jail policy regarding housing." *Id.* at 35-36. These arguments and evidence further suggest a lack of a link between County policy and Perez's suicide. In fact, they suggest that, if another case worker had simply followed County policy, Perez's suicide could have been prevented. Thus, while these arguments may provide further support of Rice's negligence, they indicate that there may not even have been a link between County policy and Perez's suicide.

For these reasons, we find that the district court was correct in granting Oakland County summary judgment.

## III. CONCLUSION

For the reasons stated above, we AFFIRM the district court's grant of summary judgment for Roberta Rice and for Oakland County.

---

**CONCURRENCE**

---

GRIFFIN, Circuit Judge, concurring. I concur in the result and join in all portions of the lead opinion except Section II.A.1. Specifically, I join in affirming summary judgment for Oakland County for the reasons stated by Judge Cudahy. I also join in affirming summary judgment for prison caseworker Roberta Rice on the basis of qualified immunity because it would not have been "clear to a reasonable [person in her position] that [her] conduct was unlawful in the situation [she] confronted." *See Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Baranski v. 15 Unknown Agents of the BATF*, 452 F.3d 433, 447 (6th Cir. 2006) (en banc) (a government agent is entitled to qualified immunity unless he violates a "clearly established" constitutional right).

I respectfully disagree, however, with Judge Cudahy's conclusion that Perez established a genuine issue of material fact with regard to whether Rice's conduct violated the Eighth Amendment (Section II.A.1.). In my view, the record does not support the allegation that Rice acted with deliberate indifference[1] to Perez's known serious medical need as we have defined that term in the context of prisoner suicide.

The lead opinion asserts that "[a] genuine issue of fact regarding the objective component of the [deliberate indifference] standard can be met by showing that Perez posed *a strong likelihood* of another suicide attempt." (Emphasis added.) The lead opinion correctly states the legal standard for deliberate indifference in the prisoner-suicide context. In our circuit,

> the proper inquiry concerning the liability of a City and its employees in both their official and individual capacities under section 1983 for a jail detainee's suicide is: whether the decedent showed a *strong likelihood* that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs.

*Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005) (emphasis added) (quoting *Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992)).

But the record simply does not show a genuine issue as to whether Perez satisfied this standard. Again, to conclude that Rice violated Perez's Eighth Amendment rights, it is not enough to establish that she may have acted with deliberate indifference to some possibility of suicide, or even a likelihood of suicide. This is a critical distinction: the record might show a genuine issue as to whether Rice acted with deliberate indifference to a real, even a substantial risk of suicide, but it does not permit a reasonable factfinder to conclude Rice was aware of a *strong likelihood* of suicide and acted with deliberate indifference to *that* very high level of risk.

As the lead opinion notes,

> *there are certainly reasons to doubt the objective conclusion that Perez posed a strong likelihood of another suicide attempt.* Dr. Hemachandra, a trained and

---

[1]This cumbersome phrase is necessary because the Eighth Amendment does *not* give a prisoner a "right to adequate medical care" *per se*. Inadequate care may or may not support a finding that the provider acted with deliberate indifference rather than some less culpable *mens rea*, such as negligence. *See Estate of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005) ("Deliberate indifference is not mere negligence."); *see, e.g., Clark-Murphy v. Forebach*, 439 F.3d 280, 291 (6th Cir. 2006) ("On these facts, it is doubtful that negligence could be proved, much less deliberate indifference.").

licensed psychiatrist, opined that Perez gave no indication of suicidal ideation during his final evaluation on November 8, 2002. Additionally, Rice's counseling notes during the time period of early to mid-November show that Perez denied any suicidal intention, and they reflect Rice's conclusion that Perez was not suicidal or otherwise in need of an enhanced watch status.

I agree, and the record does not create a genuine issue as to whether Perez posed a *strong* likelihood of another suicide attempt *at that particular time*. Judge Cudahy approves the district court's view that

> Rice cannot rely on Dr. Hemachandra's November 8, 2002 assessment of whether Perez was suicidal (he determined that Perez was not on that date) because the situation did not remain stable between that date and the date Rice assigned Perez to a single cell. Rice learned during this time that Perez was refusing to take his medication without Dr. Hemachandra's consent or direction, and also that Perez was experiencing problems getting along with other inmates.

The lead opinion does not explain, however, how knowledge that Perez was not getting along with other inmates equates or necessarily leads to knowledge that there was a strong likelihood that he would try to kill himself. Judge Cudahy does not identify any expert opinion or other evidence that supports such a correlation. With regard to Rice learning that Perez had been refusing to take his medication since his November 8 visit to Hemachandra, it is important to note *why* Perez apparently refused to take the medication during that period. As Rice knew from her own conversation with Perez just before the fateful housing decision, the reason Perez eschewed the medication was simply because he did not feel suicidal and had plans to improve his life on various fronts.

As permitted by her employer, Rice participated in monitoring and interacting with Perez and making treatment and related housing decisions. The record does not suggest that her final housing and behavior-watch decisions were taken with deliberate indifference to a strong likelihood of suicide – even assuming arguendo that there *was* such a strong likelihood. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Judge Cudahy's attempt to establish the genuine possibility that Rice perceived such a strong likelihood of suicide at the relevant time is unavailing. The lead opinion asserts,

> Throughout her time treating Perez, Rice made the decision, on several occasions (most recently a month before he committed suicide), to place Perez on an elevated watch status and to house Perez in an observation cell or with roommate(s). Viewing this evidence in the light most favorable to Perez Sr., this evidence can be construed as demonstrating that Rice had the subjective knowledge, *at least at times*, that Perez posed a risk of suicide.

The fact that Rice knew Perez was or might be suicidal at earlier times simply does not support the inference that Rice knew that Perez posed a risk of suicide *at the later time*, when Perez appeared and claimed to be in a much-improved state of mind.

As a caseworker who had both some relevant training and familiarity with Perez, Rice acted in reliance on her interaction with and observation of Perez, and on Perez's repeated, very recent statements that (1) he had lied about wanting to commit suicide, seeking only to obtain medication to help him cope with incarceration rather than his medical condition, (2) he had continued lying about his suicidal ideation and mental state (to both Hemachandra and Rice) in order to obtain medication to sell to fellow prisoners, (3) he believed that he still did not need, and so was refusing

to take, that medication, and (4) he had a newfound religious faith that gave him purpose, as well as a desire to better himself and prepare for the future by earning a GED. *Cf. Soles v. Ingham Cty.*, 316 F. Supp. 2d 536 (W.D. Mich. 2004) (mental-health worker was entitled to summary judgment on § 1983 claim; although she knew prisoner had recently attempted suicide and still reported feeling somewhat depressed, she was not deliberately indifferent by returning prisoner from observation cell to general population, where examination five days earlier showed "significant improvement in [prisoner's] mood and attitude," prisoner "seemed less agitated and told her he had not experienced suicidal thoughts for at least a week," and guards contemporaneously reported that prisoner "had been less withdrawn and was interacting more normally with others"), *aff'd*, 148 F. App'x 418 (6th Cir. 2005). Accordingly, this was not a case where the most recent information available to the prison official suggested a likelihood – let alone a *strong* likelihood – of suicide. This information, in fact, suggested quite the opposite.

> Finally, the lead opinion asserts,
>
> Dr. Hemachandra testified that past threats or attempts at suicide are considered when determining whether an individual is suicidal, though someone who has previously considered or attempted suicide will not necessarily do so again. Dr. Hemachandra also testified that a patient who fails to take prescribed psychotropic medication posed a risk of becoming depressed, unable to control his moods, and ultimately suicidal. *Perez v. Oakland County et al.*, 380 F. Supp. 2d 830, 841 (E.D. Mich. 2005). Perez also presented expert testimony stating that individuals who suffer from schizophrenia and have made past suicide attempts are more likely than others to attempt suicide again.

Hemachandra's opinion on this subject may be correct. It may also be that prison caseworkers such as Rice should be familiar with these alleged statistical trends and should take them into account when evaluating a prisoner with a history of schizophrenia, attempted or threatened suicide, and/or refusal to take prescribed medication. But Judge Cudahy does not rely on any evidence that *Rice* was in fact aware of these general indicators of increased risk. This omission is significant, because it is Rice's knowledge and perception of Perez's imminent likelihood of suicide that is relevant, not the opinion of Hemachandra or anyone else about Perez's suicide risk factors. *Cf. Horn by Parks v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 661 n.2 (6th Cir. 1994).

With regard to Perez's known failure to take his medication in the period between his last Hemachandra visit and his last Rice visit, the record shows merely that Rice must have credited Perez's insistence that he no longer *needed* the medication because he did not wish to kill himself. Admittedly, it may have been unwise to credit Perez's characterization of his state of mind and his explanation for discontinuing his medication, particularly in light of his history and his unmedicated state itself. If so, that means only that Rice may have been negligent in *failing* to perceive a strong likelihood of suicide. If one fails to perceive a strong likelihood, one cannot then be *deliberately* indifferent to it. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994) ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."); *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

In summary, Perez failed to carry his burden of establishing a genuine issue of material fact that an objectively strong likelihood of suicide existed at the time of the assignment to a single cell. Even if such a strong likelihood existed at that time, the surrounding circumstances and the most recent information available to Rice preclude a finding by a reasonable trier of fact that Rice was *aware* of such a likelihood and acted with deliberate indifference toward it. This is an additional and independent reason why Rice is entitled to immunity. Viewing the evidence in the light most

favorable to the non-moving party, Perez has failed to establish that Rice committed a violation of the Eighth Amendment.

For these reasons, I concur in the result and join in all portions of the lead opinion, except Section II.A.1.

<hr>

### CONCURRING IN PART, DISSENTING IN PART

<hr>

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. I agree with Judge Cudahy in Part II.A.1 that summary judgment should not be granted on the issue of whether Rice committed a constitutional violation. However, I do not believe that the grant of qualified immunity to Rice is justified in this case, and I therefore respectfully dissent.

We assess claims of qualified immunity according to a three-step test:[1]

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff[ ] show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Sample v. Bailey*, 409 F.3d 689, 695-96 (6th Cir. 2005) (alteration in original) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)). "Qualified immunity must be granted if the plaintiff cannot establish each of these elements." *Id.* at 696 (internal quotation marks omitted). Rice is not entitled to qualified immunity on the basis of the first step of this test, because it "there is a genuine issue of fact as to whether Rice violated Perez's Eighth Amendment constitutional right." Majority Op. at 8.

In analyzing the clearly-established prong of the test, the majority states that our precedents "were not enough, on their own, to alert a reasonable caseworker that Rice's conduct was deliberately indifferent under the circumstances." Majority Op. at 9. However, we have held that "once a prisoner has been deemed suicidal, it is clearly established that the prisoner is entitled to continuing medical treatment." Majority Op. at 10 (citing *Comstock v. McCrary*, 273 F.3d 693, 711 (6th Cir. 2001), *cert. denied*, 537 U.S. 817 (2002)). The majority distinguishes this case from *Comstock* on the basis that "Perez was not deemed to be suicidal at the time he was moved to the single cell," and that Perez is thus alleging "a right to a correct assessment of his suicide risk or an effective suicide-monitoring arrangement." Majority Op. at 10 (citing *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989), *cert. denied*, 494 U.S. 1027 (1990)). I do not agree with the characterization of the issue in this case as a mere question of screening, because it is based solely on Rice's conclusion at the November 18, 2002 meeting that Perez was not suicidal. As I will explain below, our precedent does not permit us to rely on Rice's summary dismissal of Perez's risk of suicide — in light of strong evidence to the contrary — to conclude that Perez was in fact "not deemed to be suicidal." Majority Op. at 10. Instead, I believe that the record compels the conclusion that this case is analogous to and governed by *Comstock* and that the right in question was clearly established well before the events in question here.

We are required to view the facts in the light most favorable to Perez. *Comstock*, 273 F.3d at 701 n.3. The record demonstrates that Perez "attempted suicide in his cell in October 2002, only a month or so before his successful suicide in November 2002." Majority Op. at 6; *see also* Joint Appendix ("J.A.") at 94 (Rice Dep. at 28). "To be sure, Dr. Hemachandra opined that [Perez] gave

<hr>

[1] "[T]he . . . three-step approach correctly encompasses the Supreme Court's approach to qualified immunity claims and serves to ensure government officials the proper protection from civil suit under the law." *Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005).

no indication of suicidal ideation during his final evaluation on November 8, 2002." *Perez v. Oakland County*, 380 F. Supp. 2d 830, 841 (E.D. Mich. 2005). However, in the time period following this meeting "Rice learned . . . that [Perez] had continued to refuse his medications, that he had not sought or obtained Dr. Hemachandra's approval of this course of action during their most recent session, and that he had experienced problems in a 10-man cell and had been stealing from his fellow inmates." *Id.* at 843; *see also* J.A. at 101-02 (Rice Dep. at 54-60). Also, "Rice presumably was aware that Plaintiff had never received any of the counseling recommended by Dr. Hemachandra." *Perez*, 380 F. Supp. 2d at 843. In her meeting with Perez, Rice concluded that he was not suicidal; however, she also noted that his insight was limited and his judgment was poor. J.A. at 102 (Rice Dep. at 60). Finally, Perez presented expert testimony "stating that individuals who suffer from schizophrenia and have made past suicide attempts are more likely than others to attempt suicide again." Majority Op. at 7; J.A. at 569 (Letter from Emanuel Tanay, M.D., P.C., to Kenneth J. Wrobel, Jr. dated Jan. 22, 2004 at 10). Given these facts, we must assume that Perez was still at risk of suicide at the time of his meeting with Rice.

In order to determine that Perez was not suicidal at the time that he was moved to the single cell, the majority disregards all of the above-listed facts and focuses solely on Rice's November 18, 2002 determination. However, it is this determination itself and Rice's subsequent failure to seek medical advice that "constituted the deliberate indifference to [Perez's] serious medical needs."[2] *Comstock*, 273 F.3d at 704. The facts of this case are analogous to the situation presented in *Comstock*, because in that case McCrary (the defendant) released Montgomery (the decedent) from suicide watch on the basis of an interview in which Montgomery stated that he was not considering suicide. *Comstock*, 273 F.3d at 698-99. McCrary argued that he did not have subjective knowledge of Montgomery's risk of suicide; however, we held that "the proper analysis requires us to ask whether McCrary perceived that Montgomery was suicidal *when he commenced his evaluation of Montgomery* [on the day that Montgomery was released from suicide watch and subsequently committed suicide]." *Id.* at 704. Similarly, the proper analysis in this case requires consideration of all of the evidence available to Rice at the time that she made her determination to place Perez in a single cell. This evidence demonstrates that Rice was aware of Perez's risk of suicide and that Perez consequently had a clearly established right to continuing medical treatment.

Finally, I believe that Rice acted objectively unreasonably in light of Perez's clearly established right to continuing medical treatment. As described above, Rice was aware of Perez's suicidal tendencies and the fact that he had previously been under close supervision because of these tendencies. *Perez*, 380 F. Supp. 2d at 843 n.10; *see also* J.A. at 99 (Rice Dep. at 45-46). The evidence — read in the light favorable to Perez — supports the conclusion that a reasonable person with Rice's knowledge would have sought medical advice before moving Perez to a single cell without special-watch status. I would accordingly reverse the district court's grant of summary judgment as to the issue of qualified immunity for Rice.

---

[2] In fact, Judge Cudahy acknowledges that "Rice's notes of her November 18, 2002 counseling session can . . . be viewed as focusing unduly on Perez's problems with other inmates, without considering his mental health needs and whether he would be at a risk of suicide if placed in a single cell." Majority Op. at 7.