**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0257n.06
Filed: April 6, 2007

**No. 06-3546**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

AMANDA CABANISS, Administrator of the
Estate of KEVIN CABANISS, Deceased,

      **Plaintiff-Appellant,**

v.

CITY OF RIVERSIDE; DAN ALIG, City of
Riverside Chief of Fire Department; GEORGE
BROWN, City of Riverside Chief of Police;
JASON CARLTON, City of Riverside Police
Officer; DAVID CRAINE, City of Riverside
Police Officer; EDWARD KRONENBERGER,
City of Riverside Paramedic; ROBERT NAFF,
City of Riverside Police Officer; AND SHON
SMITH, City of Riverside Paramedic,

      **Defendants-Appellees.**

      ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO

_____/

**BEFORE:**    MARTIN and CLAY, Circuit Judges; and POLSTER, District Judge.[*]

    **CLAY, Circuit Judge.**  Plaintiff Amanda Cabaniss ("Plaintiff") brings these claims on

behalf of the estate of her late father, Kevin Cabaniss ("Cabaniss"). Plaintiff alleges that Defendants

City of Riverside, Dan Alig, George Brown, David Craine, Jason Carlton, Robert Nash, Edward

_____

    [*]The Honorable Dan A. Polster, United States District Judge for the Northern District of
Ohio, sitting by designation.

Kronenberger, and Shon Smith violated the Fourth and Eighth Amendment rights of her father; and, additionally violated several Ohio state laws, resulting in their liability for his death. For the reasons set forth below, we **AFFIRM** the order of the district court granting summary judgment with respect to all Defendants.

## BACKGROUND

On May 21, 2003, Kevin Cabaniss visited his friend, Albert Fugate, at Fugate's home. During the visit, Cabaniss consumed about 1.5 pints of whiskey and became extremely intoxicated. According to Fugate, Cabaniss was so intoxicated that he was vomiting uncontrollably and could barely speak. Because Cabaniss was also being belligerent and destructive to Fugate's home, Fugate took Cabaniss outside of the house to let him sober up. Once outside, Cabaniss walked to the house of a neighbor and broke the glass in an outside lamp. Fugate observed as Cabaniss "put his hands in [the] light socket and acted like it electrocuted him" and then returned to the lawn near Fugate's home and lay down. (J.A. at 739). One of Fugate's neighbors called 911 and reported Cabaniss' disruptive behavior. When the police arrived, Fugate and several of his neighbors were all at the scene.

Defendant Officer David Craine arrived first and observed Cabaniss lying on the ground, clenching his fists and "acting agitated." (J.A. at 630). Craine asked one of the onlookers if Cabaniss was a diabetic because he was "acting disorientated and agitated." (J.A. at 631). Craine was informed by Fugate that Cabaniss had gotten drunk, had broken a lamp and that Fugate thought he was trying to electrocute himself. Craine spoke with three of the onlookers about Cabaniss, but

he could not remember specifically who told him the information he was given. Craine was told that Cabaniss "had freaked out," and that he "was kind of a space cadet." (J.A. at 631-32).

Defendants Officers Naff and Carlton arrived shortly after Craine. (J.A. at 637). The officers asked whether Cabaniss was suicidal and Fugate recounted the incident from earlier when Cabaniss broke the lamp and speculated that he had been trying to electrocute himself. Fugate also told the officers that in the past Cabaniss had "jumped out of cars, so [he] would say, yeah, [Cabaniss] is probably suicidal." (J.A. at 739). The officers began questioning Cabaniss, who was unresponsive to their questions. He spit at the officers when they tried to help him stand up. Carlton told him if Cabaniss spit at him again, Carlton would "kick his teeth in." (J.A. at 742). When Cabaniss spit at them again, the officers flipped Cabaniss onto his stomach, handcuffed him, and placed him under arrest for disorderly conduct. Cabaniss refused to give the officers his arms to be handcuffed, so both Carlton and Craine were needed to effectuate the arrest. After Cabaniss had been handcuffed, the officers walked Cabaniss to the police car. As they walked, Cabaniss continued cursing at them and telling them he had been in Vietnam and that he would kill them.

The officers attempted to seat Cabaniss in the backseat of the car and seat belt him. However, Cabaniss would not cooperate with the officers and once he was seated in the vehicle, he repeatedly slid out of the officers' reach so they could not secure him with a seat belt. The officers eventually stopped trying and simply let him sit, unsecured, in the back of Carlton's police cruiser. Soon after, Defendants Edward Kronenberger and Shon Smith, Riverside City paramedics, arrived on the scene. Kronenberger let Cabaniss out of the cruiser and told him he was there to help. Kronenberger asked if Cabaniss was injured or needed any assistance and Cabaniss cursed at him

and threatened Kronenberger and his family. Cabaniss did not allow Kronenberger to touch him, so Kronenberger was significantly limited in his ability to conduct a full examination. Kronenberger noticed that Cabaniss smelled strongly of alcohol and assumed Cabaniss' behavior was due to extreme intoxication. Kronenberger determined he would be unable to get Cabaniss to cooperate with his examination and told him to sit in the police car.

Kronenberger returned to the lawn to question the bystanders about Cabaniss' behavior. He was told by someone, who identified himself as Cabaniss' boss, that Cabaniss had a mental problem. Kronenberger testified that he understood that comment to refer to the way that Cabaniss was currently behaving and did not take it as advice that Cabaniss was actually mentally unwell. After that exchange, Defendants Kronenberger, Smith, and Naff all left the scene.

Carlton was able to get Cabaniss' identification from Fugate and returned to the police cruiser where Cabaniss was. When Carlton found out Cabaniss' birth date, he pointed out that Cabaniss could not have been in Vietnam because he was born in 1960. In response to this, Cabaniss began kicking in the backseat of the car. Carlton later described his kicks as "wimpy" and explained that he allowed Cabaniss to proceed kicking because he knew he could not break anything. (J.A. at 459). Carlton, who drove the cruiser in which Cabaniss was being held, did not secure Cabaniss in a seat belt in the cruiser. Carlton got into his cruiser and Craine pulled up next to him so that the officers could talk. Craine noticed that Cabaniss was hitting his head on the plexiglass window that separated Cabaniss from Carlton and also that he was pushing against it with his feet. Craine warned Carlton to keep an eye on Cabaniss, and Carlton stated that he noticed his plexiglass window was coming out about two inches and Cabaniss was pressing on it with his feet and it began to crack.

4

Carlton warned Cabaniss several times to stop pushing the window and hitting his head against it, but Cabaniss did not stop. Craine asked Carlton, "do you want me to spray him?" and Carlton responded "No, I will." (J.A. at 651). Carlton then rolled down the back window and walked around to the window. He told Cabaniss one last time that he would be sprayed with pepper spray if he did not stop kicking and banging his head on the plexiglass. Carlton got out of the vehicle and went to the driver side window and sprayed pepper spray at Cabaniss, who was sitting about halfway between the two backseat windows. Craine instructed Carlton that Cabaniss would need to be decontaminated, which consisted of having the pepper spray residue cleaned from his face, before he could be admitted to the jail. Carlton drove to the Police/Fire Station to have Cabaniss cleaned up, and Craine followed them. Naff, who had returned to the department earlier, met Craine and Carlton outside and assisted as the officers used a hose to rinse the remaining residue off of Cabaniss' face. After he had been decontaminated, Cabaniss told the officers that the water had been soothing and he was feeling better. He asked if he could stand up outside of the cruiser. They told him no, but he tried to stand anyway and fell down in the process. Carlton tried to grab him, but was unable to do so in time and Cabaniss fell to the ground and hit his head on the concrete.

Both Craine and Carlton observed a bump on Cabaniss' head from the fall. Craine went to get Kronenberger from inside. According to Kronenberger and Carlton, Cabaniss "purposefully lunge[d] away from Carlton" as Carlton tried to control him and struck his head on the ground again, however, neither Naff or Craine observed such an incident. (J.A. at 460-61). Kronenberger and other paramedics treated Cabaniss immediately, but he ultimately died as a result of swelling on his brain as a result of the blow to his head.

Plaintiff originally brought twenty-three claims against Defendants, many of which were repetitive of others. Defendants moved for summary judgment on all claims, and Plaintiff cross filed for summary judgment on the claims. As most facts were undisputed, the district court determined that there existed no genuine issues of material fact. The district court held that Plaintiff did not allege sufficient facts to make any of her claims and ultimately granted Defendants motions for summary judgment and dismissed all claims. Plaintiff appeals that order with respect to four claims: her claim of excessive force, her claim of deliberate indifference, her claim of failure to train, and her state law claims, over which the district court exercised supplemental jurisdiction and are, therefore, properly before this Court.

## DISCUSSION

**I. The district court properly granted Defendants' motion for summary judgment with respect to all claims against Defendants Alig, Brown, and Smith**

### A. Standard of Review

We review a district court's grant of summary judgment *de novo*. *Blackmore v. Kalamazoo*, 390 F.3d 890, 894-95 (6th Cir. 2004). Summary judgment is proper where "the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in favor of the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B. Analysis

It is well-established that where a party does not present an issue in the initial briefs on appeal that issue is deemed waived. *Thaddeus-X v. Blatter*, 175 F.3d 378, 403 (6th Cir. 1999). It has likewise been established that where an argument is presented in a perfunctory and cursory manner, it is considered waived and we may not address it. *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997). Because Plaintiff mentions Defendants Alig, Brown, and Smith only in passing and fails to assert any facts that connect these Defendants to any of the events that form the basis of Plaintiff's claims, we find that the arguments against these Defendants have been waived. *See id*. Thus, the district court properly granted summary judgment with respect to these parties.

## II. The district court properly granted Defendants' motion for summary judgment with respect to Plaintiff's excessive force claim

### A. Standard of Review

For the same reasons stated above, we review a district court grant of summary judgment *de novo*. *See supra* Part I.A.

### B. Analysis

#### 1. Section 1983

Section 1983 is not an independent source of constitutional rights. Instead, it operates as a vehicle to assert violations of other constitutional rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). Thus, in order to bring a § 1983 claim, a plaintiff must begin by identifying a violation of an existing constitutional right. *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001). The plaintiff must then show that the right was violated by state actors who were acting under the color of state law. *Id*. Because Plaintiff alleges that Defendants violated Cabaniss' Fourth Amendment rights by acting with excessive force, the claim contains the requisite constitutional

7

violation.  Further, we have past held that a claim of excessive force while a person, who has been seized, is in custody, is properly governed by the Fourth Amendment.  *Phelps v. Coy*, 286 F.3d 295, 300 (6th Cir. 2002).   Thus, this § 1983 claim is properly stated.

### 2.        Excessive Force

The touchstone of a Fourth Amendment excessive force claim is reasonableness.  *Graham,* 490 U.S. at 395.  This Court must consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight" to ascertain whether the officers' use of force was reasonable.  *Id*. at 396.  "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case."  *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).  Thus, reasonableness  must be adjudged from the point of view of the officer at the time of the incident.  *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006)

Government officials may invoke qualified immunity to avoid "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Thus, even after a plaintiff makes the necessary showing with respect to the underlying constitutional violation, a defendant may still assert qualified immunity to succeed on summary judgement.

Once it can be shown that a defendant violated a constitutional right, the relevant question for the qualified immunity inquiry is whether that right was clearly established.  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  This question asks "whether it would be clear to a reasonable officer that his

conduct was unlawful in the situation he confronted." *Id*. Qualified immunity does not operate like an affirmative defense; instead, the plaintiff bears the burden of showing that a right was clearly established. *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999). Additionally, the plaintiff must show that the right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 202. Thus, if reasonable officers could disagree about the lawfulness of the conduct in question, immunity must be granted. *Key*, 179 F.3d at 1000.

As we have held, "the lack of Supreme Court or Sixth Circuit precedent 'is not a sufficient condition for concluding that the law is unclear on the subject and [thus that] qualified immunity must be granted to a defendant.'" *Perez v. Oakland County*, 466 F.3d 416, 427 (6th Cir. 2006) (quoting *McCloud v. Testa*, 97 F.3d 1536, 1556 (6th Cir. 1996)). "[T]he decisions of other courts can also clearly establish the law[,] but they must point [unmistakably] to the unconstitutionality of the conduct and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." *Summar v. Bennett*, 157 F.3d 1054, 1058 (6th Cir. 1998) (internal citation omitted). "There need not be a case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

In the present case, Plaintiff alleges that the officers used excessive force both in using a water hose on Cabaniss and in using pepper spray on him. The argument that the water hose constituted excessive force is entirely meritless because Plaintiff does not even attempt to allege that the hose was used forcefully. In fact, the record seems to indicate that Cabaniss enjoyed being rinsed

9

with the hose. Thus, we will address the excessive force claim only with respect to the use of pepper spray.

Only Carlton may be liable for excessive force because he was the officer to administer the pepper spray and was assisted by no one else. *See Sandul v. Larion,* 119 F.3d 1250, 1253 (6th Cir. 1997) (refusing to hold officers who did not participate in the arrest of the plaintiff liable for excessive force). As a general rule, we have held that the use of pepper spray is excessive force when the detainee "surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002)). The logical corollary to this rule is that there is a very limited class of circumstances when the use of pepper spray is proper, including where a detainee is unsecured, acting violently, and posing a threat to himself or others. In *Monday v. Oullette*, 118 F.3d 1099 (6th Cir. 1997), for example, we found proper the use of pepper spray where the victim needed to be subdued to prevent a danger to himself. *Id*. at 1104-05. In *Gaddis v. Redford Twp*., 364 F.3d 763, 774 (6th Cir. 2004), we found the use of pepper spray to be reasonable when officers feared that an arrestee, armed with a knife, was going to flee.

In the present case, Cabaniss had been uncooperative with Carlton when he tried to secure him in a seatbelt, and thus, was unsecured in the backseat of the car. Further, he was kicking the plexiglass and beating his head against it, exhibiting signs that he presented a danger to himself and that he might be a flight risk. As Plaintiff correctly observes, Carlton described Cabaniss' kicks as "wimpy." (J.A. at 459). Thus, viewing these facts in the light most favorable to Plaintiff, we must assume that Cabaniss' kicks were incapable of doing any real damage. However, at most, this

undermines only the contention that Cabaniss posed a flight risk. He was still unsecured in the backseat and was banging his head repeatedly on the glass, posing a danger to himself. Carlton warned him repeatedly to stop and he would not do so. Taken together with the information Carlton had received earlier that Cabaniss' friends suspected he could be suicidal, Carlton had every reason to fear that Cabaniss posed a real threat to his own safety and needed to be subdued. These facts fall well within the class of situations that we have in the past held may reasonably justify the use of pepper spray. *Champion*, 380 F.3d at 903. Thus, we conclude that no constitutional violation took place and need not address Carlton's claim that he was entitled to qualified immunity.

**III.     The district court properly granted Defendants' motion for summary judgment with respect to Plaintiff's deliberate indifference claim**

**A.     Summary Judgment**

For the same reasons stated above, we review a district court grant of summary judgment *de novo*. *See supra* Part I.A.

**B.     Analysis**

**1.     Section 1983 Claim**

Again, we begin by noting that Plaintiff's § 1983 claim is properly formulated, inasmuch as a deliberate indifference claim is a claim of a violation of a detainee's Eighth Amendment right to be free from treatment that is amounts to cruel and unusual punishment.

**2.     Deliberate Indifference Standard**

"[T]he Eighth Amendment prohibits mistreatment only if it is tantamount to "punishment," and thus courts have imposed liability upon prison officials only where they are 'so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain.'"

*Perez*, 466 F.3d at 423 (quoting *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994)).  This Court has defined "[a] serious medical need [as] 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Blackmore*, 390 F.3d at  897 (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)).

The "deliberate indifference" standard requires a showing of more than mere negligence. We have held that there are two distinct prongs of this standard: An objective component and a subjective component.  First, the medical need of the detainee "must be, objectively, sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  We have held that where there are "minor or non-obvious" injuries to a detainee, there must be a showing that the defendant's deliberate indifference was the proximate cause of the detainee's ultimate injuries.  *Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005).  The subjective component requires facts that indicate "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).  "Deliberate indifference requires a degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir. 2005) (quoting *Farmer*, 511 U.S. at 835).

In the present case, it is not entirely clear how Plaintiff contends Defendants were deliberately indifferent.  Plaintiff seems to make a general argument that because the officers and paramedics knew that Cabaniss had exhibited suicidal behavior and was intoxicated, his accidental

fall resulted from deliberate indifference. However, this is insufficient to make a deliberate indifference claim because being intoxicated is not the type of obviously serious medical need which can easily satisfy the objective prong of the deliberate indifference inquiry. *See Owensby*, 414 F.3d at 604. In other words, a showing of proximate cause is imperative in a case like this, where the medical needs of the detainee are not obvious, and Plaintiff cannot make such a showing. This would be a different case if Cabaniss had died as a direct result of the condition that he displayed and Defendants had ignored that condition. For example, if Cabaniss had died of alcohol poisoning, the fact that he exhibited signs of intoxication would be relevant to our inquiry. At most, Cabaniss may have died as a result of an accident that may have been facilitated by his intoxication. The deficiency in Plaintiff's allegation stems from the fact that there is an insufficient causal connection demonstrated between an accidental fall like the one Cabaniss suffered and his intoxication. Cabaniss would not have suffered his fatal fall but for the fact that he acted contrary to the warnings of Defendants, which relieves them of responsibility for being the proximate cause of his death.

Likewise, the fact that Defendants had been warned by Cabaniss' friends that he might be suicidal cannot save this claim. Because it is not argued that suicide was the cause of Cabaniss' death, suicidal tendencies cannot be the predicate for Plaintiff's deliberate indifference claim. While suicidal tendencies create a heightened standard for the requirement that a detainee to be monitored, Plaintiff does not contend that Cabaniss was not under observation. In fact, the record shows that when Cabaniss asked if he could stand on his own outside of the vehicle, Defendants warned him not to do so. Further, when he began to fall, Defendants tried to catch him, but were unsuccessful.

13

Finally, as soon as Cabaniss fell, Defendants retrieved paramedics to give him immediate medical attention. These facts simply do not amount to deliberate indifference.

Arguably, the conflicting accounts of Cabaniss' fall are relevant here. After the fall, Carlton, who had tried to catch Cabaniss, held him and tried to inspect his injury while they waited for the paramedics to come outside. According to Carlton and Kronenberger, Cabaniss wrenched himself away from Carlton and pounded his head on the concrete again. Naff and Craine, however, denied seeing this happen. Importantly, Plaintiff does not make the argument that Cabaniss inflicted his fatal injury upon himself. However, viewing these facts in the light most favorable to Plaintiff, albeit a light she failed to shed on the facts, we can entertain the possibility that Cabaniss did in fact purposely hit his head against the concrete again after his initial fall. Thus, we may construe Plaintiff's deliberate indifference argument to be that Defendants acted with deliberate indifference to Cabaniss by failing to properly monitor a detainee who they knew to have exhibited suicidal tendencies. Such an argument, however, would not be successful. Inasmuch as deliberate indifference requires a greater degree of culpability than negligence, it certainly requires a greater degree of culpability than simply failing to adequately protect a detainee while exerting one's best efforts to do so. *See Miller,* 408 F.3d at 812. In this case, the officers warned Cabaniss not to attempt to stand on his own, but he did so anyway. When he began to fall, it is undisputed that the officers tried to catch him and, when they were unsuccessful, immediately summoned paramedics to treat him. Cabaniss was never left unobserved and he was able to hurt himself despite Defendants' reasonable efforts to protect him. Finally, he was immediately provided medical

14

attention that was, unfortunately, ultimately unsuccessful. While these facts are certainly tragic, they simply do not leave Defendants liable for deliberate indifference. *See Comstock*, 273 F.3d at 703.

Plaintiff made a different argument at oral argument that is essentially that Kronenberger acted with deliberate indifference during his initial inspection of Cabaniss by failing to give Cabaniss a full medical inspection. Plaintiff claims that had Kronenberger fully inspected Cabaniss at the outset, his fatal fall could have been avoided because he would have been taken directly to the hospital and not to the police station. Plaintiff does not, however, allege precisely what was wrong with Cabaniss that Kronenberger would have discovered with a fuller examination. Thus, once again, Plaintiff fails to connect the dots between Kronenberger's actions and the prevention of Cabaniss' injury. Plaintiff does not allege that Kronenberger would have discovered a serious medical need had he inspected Cabaniss more fully, only that it is possible he would have taken him to a different location. We will not engage in speculation about how things would have been different had Cabaniss been brought to a hospital instead of a police station when the ultimate cause of his injury was not a failure of medical attention but an accidental fall.

**IV.    The district court properly granted Defendants' motion for summary judgment with respect to Plaintiff's failure to train claim against the City of Riverside**

**A.    Standard of Review**

For the same reasons stated above, we review a district court grant of summary judgment *de novo*. *See supra* Part I.A.

**B.    Analysis**

According to the Supreme Court:

> [a] city is not liable under § 1983 unless a municipal "policy" or "custom" is the moving force behind the constitutional violation. Only where a failure to train reflects a "deliberate" or "conscious" choice by the municipality can the failure be properly thought of as an actionable city "policy." *Monell* [*v. New York City Dept. of Social Services*, 436 U.S. 658 (1978)] will not be satisfied by a mere allegation that a training program represents a policy for which the city is responsible. Rather, the focus must be on whether the program is adequate to the tasks the particular employees must perform, and if it is not, on whether such inadequate training can justifiably be said to represent "city policy." Moreover, the identified deficiency in the training program must be closely related to the ultimate injury.

*City of Canton v. Harris*, 489 U.S. 378 (1989). We have formulated a three-part test which requires that "[t]o succeed on a failure to train or supervise claim [under a § 1983 theory], the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). In order to make this showing, we have held that this standard requires that the "[p]laintiff . . . do more than point to something the city could have done to prevent the unfortunate incident." *Kahlich v. City of Grosse Pointe Farms*, 120 Fed. App'x. 580, 585 (6th Cir. 2005) (citing *City of Canton*, 489 U.S. at 392 (citation omitted)). Importantly, we only turn to this test once the plaintiff has established that the agents of the municipality have violated a constitutional right. *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001). Thus, if the agents of a municipality have violated no constitutional right, the municipality can never be liable under § 1983 for a failure to train. *Id*.

In the present case, we have concluded that no constitutional rights have been violated by any of the individual Defendant agents of the City of Riverside. We therefore conclude that the City of

Riverside cannot be liable for failure to train and the district court properly granted summary judgment in favor of the municipality.

**V.    The district court properly granted Defendants' motion for summary judgment with respect to Plaintiff's state law claims against all Defendants**

### A.    Standard of Review

For the same reasons stated above, we review a district court grant of summary judgment *de novo*. *See supra* Part I.A.

### B.    Analysis

It is not clear from Plaintiff's brief which state law claims are being brought against the City of Riverside and which ones are being brought against the individual Defendants. Oral argument did little to alleviate the confusion; thus, we will discuss all of these claims with respect to liability for both the municipality and the individual Defendants. Plaintiff brings a claim against Defendants under Ohio law for failure to protect, wrongful death and survivorship, and assault and battery. Both the individual Defendants and the City of Riverside claim immunity against all of the state law claims.

#### 1.    The City of Riverside

Ohio Revised Code § 2744.02 provides, in relevant part, that:

(A) (1) For the purposes of this chapter, the functions of political subdivisions are hereby classified as governmental functions and proprietary functions. Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function . . .

(B) Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to person

17

or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function, as follows:

(1) Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority. The following are full defenses to that liability:

(a) A member of a municipal corporation police department or any other police agency was operating a motor vehicle while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct.

OHIO REV. CODE § 2744.02.

Section 2744.02 immunity clearly applies to the City of Riverside. However, Plaintiff argues that the operation of the motor vehicle exception to that immunity, embodied in § 2744.02(B)(1), applies to the present case because Cabaniss' death resulted from the operation of a motor vehicle. The motor vehicle exception denies immunity to a municipality when a death or injury arises due to "negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority." § 2744.02(B)(1). Plaintiff cites *Groves v. Dayton Pub. Schools* for the proposition that failing to properly assist an impaired passenger exit a motor vehicle may be a violation of § 2744.02 under the motor vehicle exception. *Groves*, 725 N.E.2d 734 (Ohio Ct. App. 1999)). As the district court correctly observed, however, § 2744.02(B)(1) still confers immunity upon a municipality for an injury that occurs once a passenger in a motor vehicle has exited that vehicle. *See Glover v. Dayton Pub. Schools*, 1999 WL 958492 (Ohio Ct. App. 1999). Thus, this issue turns on a factual issue: whether Cabaniss was injured once he had already exited the vehicle or while he was in the process of exiting the vehicle. The district court concluded that because Cabaniss fell after he had already exited the vehicle, the City of

18

Riverside is immune from state law claims. Even though there is conflicting testimony concerning when Cabaniss fell, it seems clear from the record that Cabaniss had exited the vehicle before falling. The district court therefore properly found immunity for the City of Riverside.

### 2. Individual Defendants

Ohio Revised Code § 2744.03 provides, in relevant part:

> (A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability: . . .
> (6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies: . .
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner

§ 2744.03. Simply put, Defendants claim that they have immunity unless Plaintiff can show that Defendants acted with malicious purpose, in bad faith, or in a wanton or reckless manner. Plaintiff agrees that she may only be successful by making such a showing, but she contends that Defendants' behavior was reckless and wanton, and, in Carlton's case, malicious. Plaintiff argues that Carlton, by spraying Cabaniss with pepper spray, acted maliciously, and that such maliciousness in that instance can be imparted upon him in all of his interactions with Cabaniss. Such an argument is not only unsupported by any case law, it is unpersuasive because, as we held earlier, we do not find that Carlton acted with excessive force in using pepper spray, which necessarily forecloses the argument that he acted maliciously. *See St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005). Further, Plaintiff's argument that the other Defendants acted recklessly and wantonly is basically a

19

recapitulation of her argument that they acted with deliberate indifference. Because, as we concluded above, we are unconvinced that she has alleged facts sufficient to even make a showing of negligence, these facts do not show that Defendants behaved wantonly, reckless, maliciously, or in bad faith. Thus, Defendants are entitled to immunity against Plaintiff's state law claims pursuant to § 2744.03.

## CONCLUSION

For the forgoing reasons, we **AFFIRM** the district court grant of summary judgment in favor of Defendants on all claims.