RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0153p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

ASHLEY WASHBURN,

        *Plaintiff-Appellant*,

        *v.*

LAWRENCE COUNTY BOARD OF
COMMISSIONERS and ATTITUDE AVIATION,
INC.,

        *Defendants-Appellees*.

No. 12-4011

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:10-cv-00464—Sandra S. Beckwith, District Judge.

Argued: May 1, 2013

Decided and Filed: May 29, 2013

Before: MARTIN, SUHRHEINRICH, and COLE, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** David E. Mills, THE MILLS LAW OFFICE LLC, Cleveland, Ohio, for Appellant. Joseph W. Pappalardo, GALLAGHER SHARP, Cleveland, Ohio, for Lawrence County Appellee, Brian S. Sullivan, DINSMORE & SHOHL LLP, Cincinnati, Ohio, for Attitude Aviation Appellee. **ON BRIEF:** David E. Mills, THE MILLS LAW OFFICE LLC, Cleveland, Ohio, for Appellant. Joseph W. Pappalardo, Timothy J. Fitzgerald, Timothy P. Roth, GALLAGHER SHARP, Cleveland, Ohio, for Lawrence County Appellee. Brian S. Sullivan, DINSMORE & SHOHL LLP, Cincinnati, Ohio, for Attitude Aviation Appellee.

_____

## OPINION

_____

BOYCE F. MARTIN, JR., Circuit Judge. Ashley Washburn sued the Lawrence County Commissioners and Attitude Aviation after an airplane-hangar door blew off

during a storm and seriously injured her. All parties moved for summary judgment, and the district court granted Lawrence County's and Attitude Aviation's motions and denied Washburn's motion. The district court held that the County and Attitude owed no duty of care to Washburn because they had no control over the airplane hangar. Washburn appeals the district court's judgment. We AFFIRM the district court.

I.

On July 20, 2008, Ashley Washburn was seriously injured when the door of an airplane hangar, T-hangar 12, blew off and hit her in the face and torso during a storm at an airpark owned by Lawrence County and operated by Attitude Aviation. The airpark consisted of a runway, a row of T-hangars, a row of "box" hangars, a fixed-base operator office, a maintenance hangar, and a tractor shed. The County had leased the T-hangars to individual airplane owners and, since 2002, it had leased the grounds of the airpark to Attitude Aviation.

Cleo Watson had leased T-hangar 12 for over twenty years and the lease was in effect at the time of the accident. In the lease, Watson agreed to assure that his "aircraft and other items incidental to the operation of said aircraft are kept in a safe, clean condition at all times so as not to risk the safety or hinder the operations of other tenants or persons on airport property." Watson also agreed to be "responsible for damages to the (original open Hangar configuration) or (Hangar that has walls and doors)" and not to "destroy, deface, impair, or remove any part of said Hangar." Watson was allowed to make "[p]hysical or structural improvements," as long as the County approved.

Twenty years ago, the previous airpark operators instructed Watson to install doors on his T-hangar at his own expense in exchange for a reduced monthly rent and a lifetime lease. Watson understood that the doors would remain with the hangar if he ever decided to vacate the premises. The doors were twenty to twenty-four feet wide and mounted on hanging tracks so that they could be opened fully. The "[l]ocks were mounted on hasps at the centerline of the doors, and two steel pins or bolts at the bottom of each door inserted into a hole cut into the concrete." Watson testified that on one or

two occasions children tried to break into the hangar and that they removed the steel pins in the bottom of the door. Watson testified that he had replaced the pins.

T-hangar 9 is leased by Larry Lemaster, the owner of Tri-State Skydivers. Lemaster operated Tri-State Skydivers from his hangar. Clients and friends of Tri-State Skydivers, Washburn among them, often congregated outside of the hangar, eating and socializing between jumps.

The rest of the grounds were leased by Attitude Aviation, who acted as the airpark's fixed-base operator. In its agreement with the County, Attitude agreed to comply with "all FAA regulations and local, state and federal law," and to enforce "airport rules, supervi[se] safety programs, perform[ ] needs assessments, promot[e] community support, train[ ] employees, [provide] accounting and financial services, and ground care."[1] The County did not assign Attitude any of the hangar leases, and Attitude had to enter into a separate lease for the maintenance hangar. In an addendum from January 31, 2002, the County and Attitude agreed that hangar leases with airport tenants would be negotiated between the tenant, the County, and Attitude Aviation. However, deposition testimony revealed that despite Attitude's repeated requests, Attitude was never included in any of the hangar lease negotiations or lease renewals. Even though Attitude leased the grounds, the County also permitted a soccer team to practice on part of the airpark field at no charge.

In addition to the County-Attitude lease, sometime after 2001 the County began accepting federal grant money through the Federal Aviation Administration to assist with a few airpark projects, such as a drainage ditch project. The County received $150,000 in grant funds. Grant recipients are required to make certain grant assurances, including that the grantee will "operate and maintain in a safe and serviceable condition the Airport and all facilities thereon and connected therewith which are necessary to

---

[1] Attitude agreed that it "shall maintain said premises continuously as a public airport and landing field. . . . Services and activities may include, but are not limited to, aircraft manufacture and repair, maintenance, parking, re-conditioning and servicing, storage of aircraft and other related equipment; . . . flight and ground instructions; . . . recreational, social civic and other activities and services intended to perpetuate the public airport facility, or to enhance and promote the airport operations, aviation career opportunities, and educational excellence for the general public."

serve the aeronautical users of the airport . . . ."  An Airport Compliance Handbook (FAA Order 5190.6B) provides additional detail on the structures that the grant assurances cover.

On July 20, 2008, Washburn arrived at the airpark with no intention to skydive. Instead, she wanted to socialize with the Tri-State Skydiving group.  That evening, the winds picked up at the airpark, and Washburn helped the skydiving group take down some of the tents and bring Tri-State's gear back into the hangar.  While she was assisting, T-hangar 12's door flew off its hinges and over the other hangars and hit Washburn, causing serious injuries including facial fractures, skull fractures, a traumatic brain injury, and a spleen laceration.

In June 2010, Washburn sued Attitude and the Lawrence County Commissioners, alleging two claims of negligence, one under the doctrine of res ipsa loquitur.  Washburn filed a partial summary-judgment motion, arguing that Attitude and the County had owed her a duty of ordinary care and that they had breached that duty.  The County and Attitude responded with their own motions for summary judgment.  The district court denied Washburn's motion for partial summary judgment and granted the County's and Attitude's motions.  Washburn appealed, arguing that the district court erred and that as a matter of law the County and Attitude owed her a duty of ordinary care, which they breached because they never inspected the hangar doors.

II.

We review grants of summary judgment de novo.  *Dowling v. Cleveland Clinic Found.*, 593 F.3d 472, 477 (6th Cir. 2010).  Summary judgment is proper if the materials in the record "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must draw all inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

This is a diversity case and both parties agree that Ohio law applies.

III.

Washburn argues that "courts uniformly recognize that the landowner or property manager typically has at least some control" over the premises when the defective condition that causes injury is on the exterior of a leased space.  In support of this argument Washburn cites one Ohio case, *Friedl v. Lackman*, 23 N.E.2d 950, 951(Ohio 1939), and cases from Arizona and California.

Washburn argues that in *Friedl* the Supreme Court of Ohio "began with the starting proposition that the owner of a structure generally owes a duty to those nearby and therefore must ensure that 'the outside of the building' is properly maintained so that it is not a danger."  In *Friedl*, a piece of window glass fell from the defendant's building, which a tenant occupied.  *Id*. at 951.  The glass hit a pedestrian on the street, and the court held that the lessor owed a duty to the pedestrian.  *Id*.  Washburn highlights that the Court determined that the owner's duty "remained the same as before the execution of the lease."  *Id*.  But Washburn misinterprets the case.  In *Friedl*, the Court found that the owner of the building was liable, not because building exteriors generally stay within the purview of a lessor, but because a term of the lease said that the "lessor shall keep the outside of said building in good repair."  *Id.*  Thus, the Court concluded, despite having leased the property, the owner continued to owe a duty of care to pedestrians as to the exterior of the building.  *Id*.

Washburn's supporting cases from California and Arizona likewise do not support her argument.  In these cases, the courts' holdings depended on lease provisions explicitly providing that the lessors reserved control over certain parts of the properties.  *Siddons v. Bus. Properties Dev. Co.*, 953 P.2d 902, 903 (Ariz. 1998) (holding that the landlord owed a duty to the plaintiff because the lease retained the lessor's control of the sidewalk and the lessor was aware that the tenants regularly placed a heavy door on the sidewalk where the injury occurred); *Liebowitz v. U.S. Office Holdings, L.P.*, No. 1 CA-CV 10-0636, 2011 WL 2178721, at *2–*3 (Ariz. Ct. App. May 31, 2011) (reversing summary judgment where a person was injured after running into a glass outer wall of an office space and the lessor retained control of the "vestibules, halls, stairways and

other similar areas" (internal quotations omitted)); *Both v. Harband*, 331 P.2d 140, 143 (Cal. Ct. App. 1958) (holding that the lessor owed a duty of care because the lease provided that the lessor maintain and repair the exterior walls of the building).

Ohio commercial-premises law supports affirming the district court. In Ohio, a commercial lessor's liability is governed by traditional common law principles of premises liability. *Hendrix v. Eighth & Walnut Corp.*, 438 N.E.2d 1149, 1151 (Ohio 1982). Liability over a leased property can be shared jointly by lessor and lessee. *Fryberger v. Lake Cable Recreation Ass'n*, *Inc.*, 533 N.E.2d 738, 741 (Ohio 1988) (noting that the lessor does not need to have exclusive power to admit or exclude). To determine a lessor's liability, we must ascertain whether "the landowner was in possession or control of the premises, or the part thereof, the disrepair of which caused the injury." *Wills v. Frank Hoover Supply*, 497 N.E.2d 1118, 1120 (Ohio 1986) (citing *Berkowitz v. Winston*, 193 N.E. 343, 344 (Ohio 1934)). Without evidence of control, the "lessor is not liable for injuries to a third party." *Id.* (citing *Ripple v. Mahoning Nat'l Bank*, 56 N.E.2d 289 (Ohio 1944)). The key to this test is whether the lessor has the ability to admit or exclude people from the premises because "such rights are attributes of ownership." *Cooper v. Rose*, 85 N.E.2d 545, 549 (Ohio 1949); *see Simpson v. Big Bear Stores Co.*, 652 N.E.2d 702, 703–04 (Ohio 1995). Thus, to determine whether a lessor has retained the ability to admit or exclude people from the premises, this Court must look at the lease's language.

Ohio courts have found lessors liable where the lease language creates joint control or sole control over parts of a leased property. *Friedl*, 23 N.E.2d at 951 (noting the lease said the "lessor shall keep the outside of said building in good repair"); *Currier v. Penn-Ohio Logistics*, 931 N.E.2d 129, 134 (Ohio Ct. App. 2010) ("Based on our review of the lease, no provision gave [the defendant] the right to admit or to exclude others from the leased premises. Moreover, there is no record evidence that [the defendant] retained such a right. Further, there is no evidence of the exercise of such a right by [the defendant], let alone a substantial exercise of it."); *Fredrickson v. Kobb Tennis Acad., Inc.*, 2002-Ohio-4861 (Ohio Ct. App. Sept. 18, 2002) (noting that the fact

that there was no provision in the lease requiring the Appellee to monitor the safety of the facilities was evidence of a lack of control). Ohio courts have found an absence of liability where the lease does not discuss the lessor's control. *Simpson*, 652 N.E.2d at 705; *Cooper*, 85 N.E.2d at 548–49. Furthermore, retaining the right to approve changes to a property does not necessarily rise to the level of control required. *Hendrix*, 438 N.E.2d at 1151 ("Although Eighth and Walnut reserve the right to enter the premises, upon reasonable notice to Merrick, for a few specified purposes, such as to inspect the premises, reservation of such a limited right does not justify a finding that the lessor retained control of the premises.").

The County does not owe a duty of care to Washburn. The County's lease with Watson fails to show the County retained any rights giving it control over the property, and there is no evidence in the record that the County retained such rights. Furthermore, the County did not exercise any rights — it never inspected the hangars or maintained any inspectors or employees on the premises. The County did not have possession and control of T-hangar 12.

Attitude likewise owes no duty to Washburn. While Attitude leased the airpark premises, the County had separate leases for the T-hangars. Attitude was not a part of the County-Watson lease and did not participate in the County-Watson negotiations for T-hangar 12. There is no evidence in the record that Attitude retained control of the hangar. Finally, Attitude never made repairs to the Watson hangar. Attitude did not have possession and control of Watson's hangar.

In an attempt to provide additional evidence of the County's and Attitude's control of Watson's hangar, Washburn points to the County's grant agreement with the Federal Aviation Administration (FAA), which she says proves that the "County [was] obligated to the federal government to maintain sufficient control." Washburn concedes that the FAA grant does not by itself create a duty.

The district court held that the FAA agreement is not sufficient evidence of control, and we agree. It is not clear that the FAA grant covers the T-hangars. As part of the grant agreement, the County agreed to operate and maintain the "airport and all

facilities which are necessary to serve the aeronautical users of the airport, other than facilities owned or controlled by the United States, shall be operated at all times in a safe and serviceable condition . . . ."

Furthermore, section 4.5(b) of the FAA Compliance manual, which deals with the scope of a grantee's maintenance obligations, describes "Facilities to be Maintained" as "all airport facilities shown on a current Airport Layout Plan (ALP) which were initially dedicated to aviation use (see definition in appendix 5)." "Aviation Use" of Real Property is defined as "[a]ll property comprising the land, airspace, improvements, and facilities used or intended to be used for any operation purpose related to, in support of, or complementary to the flight of aircraft to or from the airfield." FAA Order 5190.6B app. Z (2009).

The FAA Grant is not evidence of the County's control of Watson's hangar. While the hangars are useful to provide cover to the aircraft, they are not "necessary" to aeronautical users. Additionally, under the "Aviation Use" definition, the privately-leased T-hangar cannot be interpreted as assisting in the "flight of aircraft to or from the airfield." The FAA grant agreement is not evidence of the County's control of Watson's T-hangar 12.

We agree with the district court that the County and Attitude owed no duty to Washburn.

IV.

Attitude argues that the Act-of-God defense bars Washburn's claim, and, in support, cites a few cases, including *City of Piqua v. Morris*, 120 N.E. 300 (Ohio 1918), which recognized an Act-of-God defense as "any irresistible disaster, the result of natural causes, such as earthquakes, violent storms, lightening and unprecedented floods . . . which could not have been reasonably anticipated, guarded against or resisted." *Id.* at 303. However, to constitute an "Act of God," the storm itself would have had to be considered the "sole cause of the injury complained of, and that it could not have been

prevented by doing any" repairs or by taking other actions. *Id*. This does not apply here, because it is not clear that the storm was the sole cause of Washburn's injury.

V.

We AFFIRM the district court.