**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0431n.06

Case No. 18-4183

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>QIUSHA MA and NENGLI SHI,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>    Plaintiffs-Appellants,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>ON APPEAL FROM THE UNITED</td></tr>
<tr><td>v.</td><td>)</td><td>STATES DISTRICT COURT FOR</td></tr>
<tr><td></td><td>)</td><td>THE NORTHERN DISTRICT OF</td></tr>
<tr><td>BON APPÉTIT MANAGEMENT CO.,</td><td>)</td><td>OHIO</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>    Defendants-Appellee.</td><td>)</td><td></td></tr>
</table>

**FILED**
Aug 19, 2019
DEBORAH S. HUNT, Clerk

BEFORE: BATCHELDER, GRIFFIN, and DONALD, Circuit Judges.

**BERNICE B. DONALD, Circuit Judge.** Qiusha Ma, a professor at Oberlin College ("Oberlin"), was sitting with a group of her students in one of the college's dining halls when a broken wall-partition fell and struck her on the head. She sued Bon Appétit, a private company that provided food services there, for negligence. The district court granted summary judgment to Bon Appétit, finding that it did not owe Professor Ma a duty to keep the dining hall safe because it did not have or exercise control over the dining hall.[1] For the reasons that follow, we **AFFIRM** the district court's order.

---

[1]The district court also granted summary judgment to Bon Appétit on Professor Ma's husband's loss of consortium claim. "Ohio law 'recognize[s] that a claim for loss of consortium is derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers bodily injury.'" *Eilerman v. Cargill Inc.*, 195 F. App'x 314, 320 (6th Cir. 2006) (quoting *Bowen v. Kil-Kare, Inc.*, 585 N.E.2d 384, 392 (Ohio 1992)). As described,

**I.**

Before the district court, Professor Ma argued that Bon Appétit owed her a duty to keep the dining hall safe and breached that duty by failing to mitigate the danger of the broken wall-partition. Bon Appétit responded that Oberlin, which owns the dining hall, never provided Bon Appétit with the right to admit or exclude individuals from the dining hall—the hallmark of premises liability in Ohio—so it did not owe Professor Ma a duty of care. The district court reviewed the management agreement between Oberlin and Bon Appétit, as well as deposition testimony and other documentary evidence, and agreed there was no genuine dispute that Bon Appétit did not have or exercise such a right. Without that right, Bon Appétit had no duty of care. The district court accordingly granted summary judgment to Bon Appétit.

We review the district court's decision to grant summary judgment de novo, *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 894 (6th Cir. 2004), and must determine whether the evidence creates a genuine dispute of material fact or entitles Bon Appétit to judgment as a matter of law on Professor Ma's negligence claim, *see* Fed. R. Civ. P. 56(a), (c). We view the evidence and draw all reasonable inferences in favor of Professor Ma, *see Scott v. Harris*, 550 U.S. 372, 378 (2007), though "[t]he mere existence of a scintilla of evidence in support of [Professor Ma's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for [her,]" *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

As detailed below, a jury could not reasonably find for Professor Ma. Ohio law only imposes a duty to keep premises safe on entities that have and substantially exercise the right to admit or exclude individuals from the premises. There is no evidence that Oberlin, which owned

---

Professor Ma's claim fails as a matter of law, thus making her husband's derivative claim suffer the same fate.

the dining hall, ever provided Bon Appétit with that right, let alone evidence that Bon Appétit ever exercised the same. Therefore, Bon Appétit did not owe Professor Ma a duty to keep the dining hall safe. Professor Ma's citations to immaterial evidence and her attempt to expand Ohio premises liability law do not persuade otherwise.

## II.

In Ohio, the jurisdiction whose law we apply in this case, "[i]t is fundamental that to have a duty to keep premises safe for others one must be in possession and control of the premises." *Simpson v. Big Bear Stores Co.*, 652 N.E.2d 702, 704 (Ohio 1995) (citing *Wills v. Frank Hoover Supply*, 497 N.E.2d 1118, 1120 (Ohio 1986)). "Control" is defined—quite simply—as having "the power and right to admit people to the premises and to exclude people from it, and involves a substantial exercise of that right and power." *Id.* (quoting *Wills*, 497 N.E.2d at 1120). To survive summary judgment, Professor Ma must introduce evidence that creates a *genuine* dispute as to whether Bon Appétit held and exercised the right to admit or exclude individuals from the dining hall. She has failed to do so.

Oberlin, which owns the dining hall, never provided Bon Appétit with the right to admit or exclude. On July 1, 2004, Oberlin "retain[ed] Bon Appétit to manage and operate Food Service for Oberlin's students, faculty, staff, employees and invited guests at its campus in Oberlin, Ohio (the 'Premises')." Management Agreement Renewal ("Agreement"), R. 28-3, PageID# 273. The Agreement sets forth Bon Appétit's limited rights and responsibilities over the dining hall in the following ways. First, Bon Appétit is Oberlin's agent in the provision of food services, subject to Oberlin's "supervis[ion of] Bon Appétit's daily operation of the Food Service Operations, including . . . safety, sanitation[,] and maintenance of the Premises." *Id.* Second, Bon Appétit does not have a "lease or license" to any portion of the dining hall. *Id.* Third, "Oberlin authorized

representatives shall have access to all food service areas at all times." *Id.* Last, Oberlin retains the unilateral power to "make reasonable regulations with regard to the use and occupancy" of the dining hall. *Id.*

If the Agreement were merely silent on the question of the ability to admit or exclude, we would be compelled to find that Bon Appétit did not have control over the premises, *Washburn v. Lawrence Cty. Bd. of Comm'rs*, 720 F.3d 347, 352 (6th Cir. 2013) (citing Ohio cases) ("Ohio courts have found an absence of liability [for negligence] where the lease does not discuss the lessor's control."), but the Agreement is not silent on this issue. Its terms are clear—and quite loquacious—that Bon Appétit does not have the right to admit or exclude: Bon Appétit does not hold a lease or license to the building; Bon Appétit may not exclude Oberlin-authorized representatives from the dining hall at any time; and Oberlin has the sole authority to make regulations regarding occupancy of the premises. Accordingly, Bon Appétit was not in "control" of the dining hall; it had no duty to keep the premises safe for Professor Ma; and the district court was correct to grant summary judgment to Bon Appétit. *See Wills*, 497 N.E.2d at 1120 ("The [alleged land possessor] is not liable for injuries to a third party in the absence of authority to exercise control over the premises to the exclusion of any control by the lessee.").

Professor Ma responds in four ways, none of which are persuasive.

**First**, Professor Ma asserts that Bon Appétit exercised the ability to admit or exclude people from the dining hall because it had keys to open and close the dining hall, it had offices in the dining hall, it assisted individuals with reservations, and a Bon Appétit employee testified that he could "possibly" close a dining room in the event a repair to a broken wall-partition was underway. None of these facts create a genuine dispute. As to holding the keys to the dining hall, maintaining offices there, and assisting with the reservation system, it is undisputed that each of

these functions was performed pursuant to Oberlin's plenary direction. Without such independent—or even shared—authority to decide who may or may not enter the dining hall, Bon Appétit was not in control of the dining hall and had no duty to keep it safe. *See id.* As to having the power to "possibly" close the dining hall, we do not find that this evidence creates a *genuine* dispute as to whether Bon Appétit held and exercised the power to admit or exclude. The specific deposition testimony is in response to a hypothetical question—so it's not evidence that Bon Appétit ever exercised the power in question—and the employee only explained what he thought he *possibly* could do in the event of a repair, which, as an inconclusive statement, does not genuinely conflict with the overwhelming evidence that Oberlin had the exclusive power to decide who could enter the dining hall.

Further, although Professor Ma identifies these four factors as purported evidence of Bon Appétit's control, she did not provide a single example of Bon Appétit actually admitting or excluding anybody from the dining hall absent Oberlin's instructions. *See Currier v. Penn–Ohio Logistics*, 931 N.E.2d 129, 134 (Ohio Ct. App. 2010) (finding no duty of care where, amongst other things, "there [was] no evidence of the exercise of such a right by [the defendant], let alone a substantial exercise of it"). Her theory of *de facto* control thus fails.

**Second**, Professor Ma cites the Restatement (Third) of Torts, contending that a person is in "control" of land not when he or she has the ability to admit or exclude, but rather when he or she has "the authority and ability to take precautions to reduce the risk of harm to entrants on the land," Restatement (Third) of Torts § 49 (2012), and that Bon Appétit satisfies this definition because the Agreement requires Bon Appétit to "take reasonable and proper care of the premises[,]" Appellant Br. at 25–26. While on the surface this argument appears compelling, the Restatement (Third) of Torts is not a reflection of Ohio law. Simply put, the Ohio Supreme Court

has not adopted the Restatement (Third) of Torts and instead "continues to apply the Restatement (Second) of Torts." *See Martin v. Lambert*, 8 N.E.3d 1024, 1035-36 n.2 (Ohio Ct. App. 2014).

**Third**, and relatedly, Professor Ma concocts an "occupation" theory of premises liability, such that any *occupier* of land owes all business invitees on that land a duty of care. The authority for her proposition is a 1988 Ohio Supreme Court case: *Fryberger v. Lake Cable Recreation Ass'n*, 533 N.E.2d 738 (Ohio 1988). While *Fryberger* does—somewhat—muddy the waters of premises liability law, we do not find Professor Ma's "occupation" theory to be consistent with current Ohio law.

In *Fryberger*, the plaintiff jumped from a private dock and hit his head on the bottom of a lake. 533 N.E.2d at 739. Suffering injury, the plaintiff sued the dock owner *and* the owners of the lake for negligence. *Id.* The owners of the lake argued that they did not owe the plaintiff a duty of care because they could not control who used the private dock from which he jumped. *Id.* at 741. The trial and appellate courts agreed, but the Ohio Supreme Court reversed, opining that "the right to admit or exclude is not the sole measure of control." *Id.* Unfortunately, the court did not elaborate further, and this statement appears to conflict with Ohio premises-liability law. *See id.* at 743 (Moyer, C.J., and Wright, J., concurring in part and dissenting in part) (noting a discrepancy between the majority decision and Ohio's general approach where a duty is determined by the relationship between the plaintiff and the party controlling the land). Rather than clarify and enumerate what additional factors may give rise to a duty of care, the court in *Fryberger* recited a list of facts from the case that it found created a genuine dispute, such as the fact that the lake's owners maintained a swimming area, controlled the water level of the lake, and patrolled the lake for safety hazards. *Id.* at 741-42. The court also highlighted that the lake's owners *did* have "some control over who is admitted to or excluded from the lake." *Id.* at 741–42.

It is unclear what exactly to make of *Fryberger's* proclamation that the ability to admit or exclude is not the sole measure of control, particularly because the lake's owners *did* retain that specific right with respect to the location where the plaintiff was ultimately injured (i.e., the lake itself). We are primarily guided, therefore, by the subsequent courts that have unanimously interpreted *Fryberger* as requiring that a land possessor subject to a duty of care have and exercise at least a shared right to admit and exclude. *See Monnin v. Fifth Third Bank of Miami Valley, N.A.*, 658 N.E.2d 1140, 1151 (Ohio Ct. App. 1995) ("[W]e believe that [*Fryberger*] stands for the proposition that one who has the power to admit or deny access to a premises has a sufficient degree of control over it to create liability to another person who is admitted to the premises and injured by a dangerous condition that exists there."); *id.* ("*Fryberger* announces no new rule on control different from that in other cases."); *Currier*, 931 N.E.2d at 134–35 ("[I]n *Fryberger*, the court merely held that liability can arise when the defendant shares the right to admit or exclude with other defendants."); *Washburn*, 720 F.3d at 352 (acknowledging *Fryberger*, yet explaining that the "key to this [control] test is whether the lessor has the ability to admit or exclude people from the premises[.]"). Indeed, since *Fryberger* was issued, Ohio's Supreme Court has stated that control is assessed by one's "power and right to admit people to the premises and to exclude people from it, and involves a substantial exercise of that right and power." *Simpson*, 652 N.E.2d at 704 (citation omitted). Therefore, we are not convinced that *Fryberger* can bear Professor Ma's "occupation" theory.

Professor Ma also relies on an Ohio appellate court decision, *Monnin*, as additional support for her "occupation" theory. 658 N.E.2d 1140. *Monnin* has a complicated history. There, a bank employee was fatally injured in the course of a bank robbery. *Id.* at 1145. Her husband sued the bank and the bank's holding company for negligence, alleging that the bank's security measures

did not keep the premises safe. *Id.* In its original decision, the Ohio Court of Appeals found that there was no evidence that the holding company possessed or exercised the right to admit or exclude individuals from the bank, and thus the holding company had no duty to keep the bank safe. *Id.* at 1146. That decision was entirely consistent with previous proclamations of Ohio law. *See e.g., Wills*, 497 N.E.2d at 1120. On reconsideration, however, the same court reversed course and extracted from its analysis any discussion of the holding company's ability to admit or exclude. *Monnin*, 658 N.E.2d at 1151–54. The court instead focused on whether the holding company directed the branch's security operations, and because the holding company did direct those operations, the court held that the holding company could have had a duty to keep the bank safe. *Id.* at 1153-54. In justifying this wider focus, the *Monnin* court explained that the *Fryberger* court had done the same thing when it considered the fact that the lake's owners "performed some actual functions related to safety and security." *Id.* at 1154.

*Monnin* is difficult to harmonize with previous and subsequent iterations of Ohio law. On the one hand, Ohio courts have repeatedly made clear that control is measured by the ability to admit or exclude, *e.g. Simpson*, 652 N.E.2d at 704, and on the other hand, the analysis in *Monnin* did not explicitly consider the holding company's ability to admit or exclude, *Monnin*, 658 N.E.2d at 1154. So how do we reconcile *Monnin* with Ohio law? There are three possibilities, none of which help Professor Ma.

It could be that, in Ohio, those who have control over the specific feature of the property that caused the injury have a duty of care related to that feature—such as the water level of the lake in *Fryberger* and the security operations of the branch in *Monnin*. That approach would not help Professor Ma, though, as the undisputed evidence shows that Bon Appétit was only responsible for reporting the broken partition to Oberlin maintenance, which it did.

It could alternatively be that *Monnin* silently equated the power to direct security decisions with the power to direct who may enter the premises (i.e., the longstanding definition of control). *See Long v. Tokai Bank of California*, 682 N.E.2d 1052, 1059 (Ohio Ct. App. 1996) ("Our rationale for reversing summary judgment [in *Monnin*] was that entities other than the occupier might be liable if they sought to occupy the premises by actually directing the activities of the occupant, i.e., in the particular case at hand, by participating in security decisions made at the premises." (citation omitted)). That attempted reconciliation would also not help Professor Ma because there is no evidence that Bon Appétit usurped Oberlin's authority to decide who could or could not enter the dining hall.

Or it could just be that *Monnin* is an enigmatic—and incorrect—outlier in its application of Ohio law, and as such we do not give it weight. *See Brown v. Raymond Corp.*, 432 F.3d 640, 646 (6th Cir. 2005) ("[W]e are of course bound by the Tennessee Supreme Court's construction of [Tennessee law], not that of the Tennessee Court of Appeals.") (citation omitted). This last option is the most compelling, particularly because the Ohio Supreme Court held that control is measured by the ability to admit or exclude just three months after *Monnin* was issued. *See Simpson*, 652 N.E.2d at 704. Professor Ma's "occupation" theory thus fails.

**Fourth**, and last, Professor Ma argues that, even if Oberlin did not formally provide Bon Appétit with control over the premises, Bon Appétit nevertheless assumed that duty through its actions. Appellant Br. at 40 (citing *Payne v. Ohio Performance Acad., Inc.*, 98 N.E.3d 1078 (Ohio Ct. App. 2017)). Professor Ma concedes in her briefing that she did not raise this assumption-of-duty theory with the district court. Reply Br. at 17. We do not consider arguments raised for the first time in this Court unless the arguing party shows that our "refusal to consider the argument would result in a miscarriage of justice." *Perez v. Oakland Cty.*, 466 F.3d 416, 430

(6th Cir. 2006). To make a miscarriage-of-justice showing, the arguing party must *at least* explain why it chose not to raise its new position before the district court. *See id.* (holding that an argument was waived where the plaintiff had an opportunity to raise it before the district court but did not do so). Professor Ma offers no such explanation; accordingly, we find her argument to be waived.

**III.**

For the aforementioned reasons, we **AFFIRM** the district court's grant of summary judgment in favor of Bon Appétit.